

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| Samuel Beníquez Méndez; Antonia Beníquez Seguí<br><br>Recurridos<br><br>v.<br><br>Teófilo Vargas Seín, Ada E. Méndez Costas y Félix Beníquez Quiñones<br><br>Peticionarios | Certiorari<br><br>2012 TSPR 2<br><br>184 DPR ____ |

Número del Caso: CC-2007-1131

Fecha: 4 de enero de 2012

Tribunal de Apelaciones:

        Región Judicial de San Juan

Juez Ponente:

        Hon. Migdalia Fraticelli Torres

Abogados de la Parte Peticionaria:

        Lcdo. Ramón A. Buitrago Iglesias
        Lcdo. Harry Anduze Montaño
        Lcdo. José A. Morales Boscio
        Lcdo. Julio M. Marcano López

Abogados de la Parte Recurrida:

        Lcdo. Nicolás Nogueras Cartagena
        Lcda. Patricia Ramírez Gelpí

Materia: Nulidad de Procedimiento de Adopción, Fraude al Tribunal Vicio del Consentimiento, Declaración de Filiación

Este documento constituye un documento oficial del Tribunal Supremo que está sujeto a los cambios y correcciones del proceso de compilación y publicación oficial de las decisiones del Tribunal. Su distribución electrónica se hace como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Samuel Beníquez Méndez;
Antonia Beníquez Seguí
Recurridos

v.                                    CC-2007-1131

Teófilo Vargas Seín, Ada
E. Méndez Costas y Félix
Beníquez Quiñones
Peticionarios

Opinión del Tribunal emitida por el Juez Asociado Señor Rivera García.

En San Juan, Puerto Rico, a 4 de enero de 2012.

El presente recurso de *certiorari* nos exige resolver tres controversias de carácter medular. En primer lugar, debemos determinar si una acción de nulidad de adopción por supuestos vicios del consentimiento de la madre biológica, por motivo de haber prestado el mismo bajo coacción e intimidación, puede instarse pasado el término de caducidad de dos años que proveía el Art. 613E del antiguo Código de Enjuiciamiento Civil, *infra*, según tal disposición existía en nuestro ordenamiento legal al momento de la adopción en controversia.

En segundo plano, tenemos que considerar si es permisible que se determine una filiación natural posterior a la consumación de una filiación adoptiva, y si ambas filiaciones están sujetas al principio de incompatibilidad de filiaciones contradictorias. De resolver que el referido principio no es de aplicación, nos corresponde precisar cuáles son los efectos jurídicos implicados por el reconocimiento posterior de la referida filiación natural y su existencia concurrente con la filiación adoptiva ya materializada.

En tercer lugar, examinaremos si la acción sobre nulidad de procedimientos de adopción y declaración de filiación presentada por los recurridos resulta improcedente en derecho por virtud de la doctrina de la cosa juzgada, o por razón de su derivada, la figura del impedimento colateral por sentencia.

Teniendo presente las controversias legales que nos atañen, pasemos a dilucidar los antecedentes fácticos aplicables a su resolución.

**I**

El Sr. Samuel Beníquez Méndez (señor Beníquez Méndez) nació el 28 de octubre de 1971.[1] Al anotarse su nacimiento en el Registro Demográfico, no se divulgó el nombre de su padre biológico.[2] No obstante, su certificado de

---

[1] Petición de *certiorari*, Apéndice, pág. 108.

[2] Íd.

nacimiento reseñaba que su madre biológica lo era la Sra. Antonia Beníquez Seguí (señora Beníquez Seguí).[3]

Luego del nacimiento del señor Beníquez Méndez, el 5 de junio de 1972, el Sr. Félix Beníquez Quiñones (señor Beníquez Quiñones) y la Sra. Ada E. Méndez Costas (señora Méndez Costas) (colectivamente, "el matrimonio Beníquez Méndez") presentaron ante el otrora Tribunal Superior una petición para su adopción.[4] En su escrito, el matrimonio adujo haber tenido bajo su custodia y cuidado al señor Beníquez Méndez desde el día en que nació.[5] Además, indicaron ser los tíos de la madre del menor -la señora Beníquez Seguí- y que ésta, junto a su hijo, habitaba con ellos por no tener los recursos para su sostenimiento o el de su prole.[6]

En apoyo a su solicitud, el matrimonio Beníquez Méndez presentó una declaración jurada de la madre del menor en la cual ésta expresaba su consentimiento a la adopción.[7] Luego de celebrar una vista el 2 de febrero de 1973,[8] el 21 de febrero del mismo año el tribunal sentenciador declaró *Ha Lugar* la referida petición.[9]

---

[3] Íd.

[4] Íd., págs. 113-114.

[5] Íd., pág. 113.

[6] Íd.

[7] Íd., pág. 115.

[8] Íd., págs. 109-112.

[9] Petición de *certiorari*, Apéndice, págs. 199-200. Esta adopción se configuró al amparo de la Ley Núm. 86 de 15 de junio de 1953, derogada, 31 L.P.R.A. 531 *et seq*.

Casi treinta años después, el 13 de mayo de 2003, el señor Beníquez Méndez y la señora Beníquez Seguí (los recurridos) presentaron ante el Tribunal de Primera Instancia una moción solicitando la nulidad de la adopción.[10] Esencialmente, argumentaron que la señora Beníquez Seguí fue coaccionada e intimidada por el matrimonio Beníquez Mendez para que prestara su consentimiento a la adopción de su hijo.[11] Como resultado, alegaron que su consentimiento era uno viciado, el cual maculaba de nulidad la resolución emitida el 21 de febrero de 1973. Ello, pues, un consentimiento viciado priva al Tribunal de jurisdicción, haciendo que la resolución emitida fuese inexistente.[12]

Asimismo, los recurridos arguyeron que el señor Beníquez Méndez fue criado por su madre desde la fecha de su nacimiento y que, incluso, a sus seis años se mudó con ésta a vivir en una residencia distinta a la de sus tíos.[13] Más aún, añadieron que el matrimonio Beníquez Méndez sólo procuraba la adopción del menor para lucrarse económicamente de un hijo que supuestamente nunca criaron.[14]

---

[10] Íd., págs. 201-203.

[11] Íd., págs. 201-202. No obstante, los recurridos no proveyeron fundamento alguno para sustentar sus alegaciones de coacción, intimidación y vicios en el consentimiento de la señora Beníquez Seguí.

[12] Íd.

[13] Petición de *certiorari*, Apéndice, pág. 202.

[14] Íd., págs. 202-203.

Mediante una resolución no fundamentada, el 13 de septiembre de 2003 el Tribunal de Primera Instancia declaró *No Ha Lugar* la moción de los recurridos.[15] Esta decisión nunca fue apelada o revisada, adviniendo final y firme.

Posteriormente, el 4 de noviembre de 2004, la señora Beníquez Seguí y el señor Beníquez Méndez presentaron una segunda reclamación sobre nulidad de procedimientos de adopción y declaración de filiación.[16] En ésta, los recurridos alegaron que la señora Beníquez Seguí, cuando aún se encontraba embarazada del señor Beníquez Méndez, fue coaccionada, amenazada y sujeta a "presiones mentales, morales, emocionales y religiosas" para que consintiese a que sus tíos -el matrimonio Beníquez Méndez- adoptasen a su hijo.[17]

Además, y distinto a lo alegado en su primer petitorio, los recurridos arguyeron que el referido patrón de coacción e intimidación se debió a que el Sr. Teófilo Vargas Seín (señor Vargas Seín), líder espiritual de la congregación religiosa *Mita*, era el padre biológico del señor Beníquez Mendez,[18] y que los tíos de la señora Beníquez Seguí -junto a otras personas de la congregación- orquestaron la adopción indicada con el fin de ocultar tal

---

[15] Íd., pág. 218. Esta decisión fue notificada a las partes el 18 de septiembre de 2003.

[16] Véase, Petición de *certiorari*, Apéndice, págs. 63-66.

[17] Íd., págs. 64 y 65.

[18] Íd., pág. 63.

realidad.[19]  Cónsono con lo anterior, solicitaron que se decretase la nulidad de la adopción bajo examen y que se ordenase al Registro Demográfico a inscribir al señor Beníquez Méndez como hijo biológico de la señora Beníquez Seguí y del señor Vargas Seín.[20]

Luego de varios trámites procesales, el 23 de diciembre de 2005 el Tribunal de Primera Instancia emitió su dictamen desestimando sumariamente los reclamos del señor Beníquez Mendez y su madre biológica.[21]  El foro primario razonó que las alegaciones y los fundamentos esbozados por los recurridos en esta segunda demanda eran idénticos a aquellos articulados en la primera solicitud de nulidad de adopción, la cual fue declarada *No Ha Lugar* el 13 de agosto de 2003.[22]

Consecuentemente, resolvió que esta primera sentencia constituía cosa juzgada con relación a la causa de acción levantada por segunda vez en contra del matrimonio Beníquez Méndez.[23]  En cuanto a la nueva alegación de que el señor Vargas Seín era el padre biológico del señor Beníquez Méndez, el tribunal sentenciador concluyó que tal argumento debió de haberse levantado oportunamente en la primera demanda de nulidad de adopción.  Debido a que los

---

[19] Íd., pág. 64.

[20] Íd., pág. 66.

[21] Véase Petición de *certiorari*, Apéndice, págs. 45-61.  Esta Sentencia fue notificada a las partes el 3 de enero de 2006.

[22] Íd., pág. 49.

[23] Íd., págs. 52-53, 54, 55.

recurridos no procedieron de esa manera, determinó que la doctrina de impedimento colateral por sentencia imposibilitaba considerar su causa de acción en contra del señor Vargas Seín.[24]

Además, el foro primario resolvió que la impugnación de adopción presentada por los recurridos era tardía, ya que el término de caducidad provisto para ello en el Código de Enjuiciamiento Civil había expirado.[25] A su vez, acogió la demanda de los peticionarios como una moción de relevo de la resolución de adopción emitida el 21 de febrero de 1973 y concluyó que la misma fue presentada tardíamente, según el término de 6 meses provisto por la otrora Regla 49.2 de Procedimiento Civil (32 L.P.R.A. Ap. III). Finalmente, el tribunal le impuso a los recurridos el pago de honorarios de abogado por temeridad.[26]

Inconformes con el dictamen del foro primario, el 2 de febrero de 2006 los recurridos acudieron en alzada al Tribunal de Apelaciones. Contando con la oposición de los peticionarios, el 6 de noviembre de 2007 el Tribunal de Apelaciones dictó su sentencia revocando al Tribunal de Primera Instancia y ordenando la continuación de los procedimientos, por entender que no era de aplicación la

---

[24] Íd., págs. 54-55.

[25] Íd., págs. 55-56.

[26] Íd., págs. 60-61.

doctrina de cosa juzgada y que la acción de nulidad de adopción no había caducado.[27]

Oportunamente, el 6 de diciembre de 2007 los peticionarios acudieron ante nos impugnando la decisión del Tribunal a quo. En su recurso de *certiorari* le imputan al foro apelativo intermedio haber cometido los siguientes errores:

PRIMER ERROR

Erró el Honorable Tribunal de Apelaciones al determinar que la causa de acción presentada por la parte recurrida no ha caducado.

SEGUNDO ERROR

Erró el Honorable Tribunal de Apelaciones al determinar que la controversia presentada en la Demanda no es cosa juzgada y/o que no existe impedimento colateral.

TERCER ERROR

Erró el Honorable Tribunal de Apelaciones al no determinar que transcurrió en exceso el término para interponer una moción de relevo de sentencia al amparo de la Regla 49.2 de las de Procedimiento Civil.[28]

Atendido el recurso de *certiorari* presentado por los peticionarios, el 4 de abril de 2008 expedimos el auto solicitado. Contando con la comparecencia de ambas partes, procedemos a esbozar el marco jurídico aplicable a las controversias inicialmente planteadas.

---

[27] Petición de *certiorari*, Apéndice, págs. 1-25.

[28] Petición de *certiorari*, pág. 8.

II

**A. Las doctrinas de cosa juzgada e impedimento colateral por sentencia.**

**1. *Cosa juzgada.***

En nuestra jurisdicción, la doctrina de cosa juzgada encuentra su origen en el Art. 1204 de nuestro Código Civil.[29] En su parte pertinente, el citado estatuto dispone lo siguiente:

> Para que la presunción de cosa juzgada surta efecto en otro juicio, es necesario que entre el caso resuelto por la sentencia y aquel en que ésta sea invocada, *concurra la más perfecta identidad entre las cosas, las causas, las personas de los litigantes y la calidad con que lo fueron*.[30]

Cuando un litigante articula exitosamente los elementos necesarios para que la doctrina de cosa juzgada sea de aplicación,

> el efecto inexorable es que la sentencia decretada en un pleito anterior[31] impide que en un pleito posterior se litiguen entre las mismas partes y sobre la misma causa de acción y cosas, las cuestiones ya litigadas y adjudicadas, y aquellas que pudieron haber sido litigadas y adjudicadas con propiedad en la acción previa.[32]

---

[29] 31 L.P.R.A. sec. 3343.

[30] (Énfasis nuestro.) Íd. Véase, también, <u>Parrilla v. Rodríguez</u>, 163 D.P.R. 263, 267 (2004).

[31] Según expusimos en <u>Bolker v. Tribunal Superior y Sosa, Interventores</u>, 82 D.P.R. 816, 824 (1961), "la sentencia que se invoque debe tener el carácter de firme, pues contra la presunción de cosa juzgada 'sólo será eficaz la sentencia ganada en juicio de revisión', y el tribunal que la dictó debe haber actuado con jurisdicción".

[32] <u>P.R. Wire Prod. v. C. Crespo & Assoc.</u>, 175 D.P.R. 139, 151 (2008), citando a, <u>Méndez v. Fundación</u>, 165 D.P.R. 253 (2005); <u>Pagán Hernández v. U.P.R.</u>, 107 D.P.R. 720, 732-733; <u>Mercado Riera v. Mercado Riera</u>, 100 D.P.R. 940, 950 (1972).

De tal manera, la doctrina bajo examen "persigue poner fin a los litigios luego de haber sido adjudicados de forma definitiva por los tribunales y, de este modo, [garantiza] la certidumbre y seguridad de los derechos declarados mediante una resolución judicial para evitar gastos adicionales al Estado y a los litigantes".[33] Es así que nuestro ordenamiento legal "protege el interés del Estado en ponerle fin a los litigios y el de los ciudadanos de no ser sometidos en múltiples ocasiones a los rigores de un proceso judicial".[34]

Como bien se desprende del articulado previamente citado, la presunción de cosa juzgada sólo cobra efecto si existe la más perfecta identidad de cosas, causas, las personas de los litigantes y la calidad con que lo fueron.[35] A continuación analizamos sucintamente cada elemento.

El requisito que requiere que exista una perfecta identidad entre las *cosas* litigadas, exige

> identificar cuál es 'el bien jurídico cuya protección o concesión se solicita del juzgador'. M. Serra Domínguez, <u>Comentarios al Código Civil y Compilaciones Forales</u>, 2da ed., Ed. Edersa, 1991, T. XVI, Vol. 2, pág. 735. Dicho análisis requiere considerar no sólo la cosa sobre la cual se suscita la controversia, sino que debe evaluarse cuál es el planteamiento jurídico que se genera en torno a ella en el procedimiento en concreto. Íd., pág. 736. Lo esencial es, pues, determinar que ambos litigios

---

[33] <u>Worldwide Food Dis., Inc. v. Colón et al.</u>, 133 D.P.R. 827, 833-834 (1993).

[34] <u>Méndez v. Fundación</u>, supra, pág. 267.

[35] Art. 1204 del Código Civil de Puerto Rico, *supra*.

se refieran a un mismo asunto. <u>Rodríguez v. Colberg Comas</u>, [131 D.P.R. 212, 220 (1992),] [c]itando a Q.M. Scaevola, <u>Código Civil</u>, Madrid, Ed. Reus, 1958, pág. 534.[36]

En cuanto a la necesidad de que exista identidad de *causas* entre ambos pleitos, hemos dispuesto lo siguiente:

> Recuérdese que causa 'es el motivo de pedir'. Scaevola, <u>Código Civil</u>, 2da ed., 1958, T. 20, pág. 535.... '[S]ignifica el fundamento capital, el origen de las acciones o excepciones planteadas y resueltas'. Manresa, <u>Comentarios al Código Civil Español</u>, 5ta ed., 1950, T. 8, Vol. 2, págs. 237-238. Así, el Tribunal Supremo de España ha dictaminado que 'la diversidad de acciones no impide la estimación de la cosa juzgada cuando la razón y causa de pedir es la misma en una y otra, y por tanto, no es el nombre ni la naturaleza, declarativa o constitutiva, la que pueda impedir identidad de la causa pretendida, sino que en este respecto la decisión es si los hechos y fundamentos de las peticiones son los mismos en lo que afecta a la cuestión planteada'. (Sentencia de 19 de febrero de 1962, Manresa, *op. cit.*) Otro decreto establece que 'la causa equivale a un fundamento o razón de pedir, siendo la acción mera modalidad procesal que es necesario ejercitar para que aquélla tenga efectividad en juicio; que si son idénticas las cosas y causas, no obsta a la eficacia de la cosa juzgada que a la acción se le dé distinto nombre, sin que desaparezca la identidad básica de la presunción porque en el segundo juicio se haga un pedimento distinto no decidido en el primero...'.

---

[36] <u>Hernández Pérez v. Halvorsen</u>, 176 D.P.R. 344, 354 (2009) (Opinión Concurrente de la Juez Asociada señora Rodríguez Rodríguez). Véase, también, <u>Lausell Marxuach v. Díaz de Yáñez</u>, 103 D.P.R. 533 (1975); <u>Mercado Riera v. Mercado Riera</u>, supra(Sobre la identidad de cosas nos dice Scaevola que: 'Puede tratarse de la absoluta identidad, en el sentido de que el segundo pleito se refiera a la finca u objeto mismo sobre que versó el primero, pero en general basta que se refiera al mismo asunto, aunque en el uno se abordase totalmente y sólo parcialmente en el otro, y aunque las cosas hayan sufrido disminución o alteración, desde el primero al segundo, que afecte su valor o alguna otra de sus condiciones'... Manresa, por otro lado, señala que: 'Cuando se reclaman derechos (verbigracia, usufructo, posesión, uso, etc.) puede una misma cosa ser objeto de diferentes litigios, salvo el caso de fundarse todos esos derechos en una misma causa ya resuelta, verbigracia, un mismo contrato declarado nulo.'". (Énfasis y citaciones omitidas.)

(Sentencia de 30 de octubre de 1965.) (Énfasis en el original.).[37]

Por último, referente a la exigencia de que exista identidad de las personas de los litigantes y la calidad con que lo fueron, basta decir que "las personas jurídicas que son parte en ambos procedimientos, cumplidos los requisitos de identidad entre las causas y las cosas, resultarían directamente afectados por la [presunción] de la cosa juzgada".[38]

"Si concurren las identidades... requeridas por el artículo 1204 del Código Civil, *supra*, no procede la dilucidación en los méritos de la controversia que está ante la consideración del foro judicial".[39] Sin embargo, aún estando presente los componentes necesarios para que la doctrina de cosa juzgada surta efecto, hemos sido diáfanos en establecer que la referida figura legal "no es absoluta y debe siempre considerarse conjuntamente con el saludable principio de que debe dispensarse justicia en cada caso".[40] Es por ello que hemos resuelto que debemos abstenernos de aplicar la aludida doctrina "*cuando al hacerlo se derrotan o se 'desvirtúan los fines de la*

---

[37] Worldwide Food Dis., Inc. v. Colón et al., supra, pág. 835, citando a, A & P Gen. Contractors v. Asoc. Caná, 110 D.P.R. 753, 765 (1981).

[38] Hernández Pérez v. Halvorsen, supra, pág. 356.

[39] Íd., pág. 354.

[40] Méndez v. Fundación, supra, pág. 268, citando a, Mun. de San Juan v. Bosque Real, S.E., 158 D.P.R. 743, 770 (2003); Pagán Hernández v. U.P.R., supra, pág. 737; Pérez v. Bauzá, 83 D.P.R. 220, 226 (1961).

*justicia, produce resultados absurdos o cuando se plantean*

*consideraciones de interés público'".*[41]

A pesar de lo expresado, "'no se favorece el reconocimiento y la aplicación liberal de excepciones a la doctrina de cosa juzgada ante el riesgo de que se afecte el carácter de finalidad de las controversias adjudicadas...'. De esta forma, evitamos se propicie la 'relitigación masiva de las controversias judiciales resueltas'".[42]

## 2. Impedimento colateral por sentencia.

La figura jurídica del *impedimento colateral por sentencia* constituye una modalidad de la doctrina de *cosa juzgada*.[43] Así, ésta persigue alcanzar los mismos propósitos procurados por la doctrina de *res judicata*, a saber: "proteger a los litigantes contra lo que representa defenderse o probar sus reclamaciones en repetidas ocasiones tratándose de la misma controversia, [y] promover la economía judicial y administrativa al evitar litigios innecesarios y decisiones incompatibles".[44]

Ahora bien, la figura bajo examen "se distingue de la cosa juzgada en que para aplicarla no es necesario que se

---

[41] (Énfasis nuestro.) Méndez v. Fundación, supra, pág. 268, citando a, Meléndez v. García, 158 D.P.R. 77, 92 (2002); Pagán Hernández v. U.P.R., supra, pág. 736; P.R.T.C. v. Unión Indep. Emp. Telefónicos, 131 D.P.R. 171, 194 (1992); Feliciano Ruiz v. Alfonso Develop. Corp., 96 D.P.R. 108, 114 (1968); Millán v. Caribe Motors Corp., 83 D.P.R. 494, 509 (1961).

[42] (Citaciones internas omitidas.) Méndez v. Fundación, supra, pág. 268.

[43] Fatach v. Triple S, Inc., 147 D.P.R. 882, 889 (1999).

[44] Méndez v. Fundación, supra, pág. 269.

dé el requisito de identidad de causas".[45] La misma "'surte efectos cuando un hecho esencial para el pronunciamiento de una sentencia se dilucida y se determina mediante sentencia válida y final, [y] tal determinación es concluyente en un segundo pleito entre las mismas partes, aunque estén envueltas causas de acción distintas'".[46]

Claro está, "la sentencia anterior es concluyente solamente en cuanto a aquellas materias que de hecho se suscitaron y verdaderamente o por necesidad se litigaron y adjudicaron, pero no es concluyente en cuanto a aquellas materias que pudieron ser pero que no fueron litigadas y adjudicadas en la acción anterior".[47] Por tal motivo, "no procede la interposición de la doctrina de impedimento colateral por sentencia cuando la parte contra la cual se interpone (1) no ha tenido la oportunidad de litigar

---

[45] Javier A. Echevarría Vargas, Procedimiento Civil Puertorriqueño, Colombia, Ed. Nomos, 2010, pág. 343. Véase, también, Rodríguez Rodríguez v. Colberg Comas, supra, pág. 221.

[46] P.R. Wire Prod. v. C. Crespo & Assoc., supra, pág. 152. En Fatach v. Triple S, Inc., supra, págs. 889-890, reiteramos que la doctrina de impedimento colateral se manifiesta en dos modalidades, a saber: la ofensiva y la defensiva.
"En su modalidad ofensiva, un demandante le impide al demandado litigar otra vez los asuntos que previamente litigó y perdió frente a otra parte. La modalidad defensiva surge cuando un demandado impide a un demandante que litigue otra vez asuntos que previamente litigó y perdió frente a otra parte. A & P Gen. Contractors v. Asoc. Caná, supra, pág. 758. Ambas modalidades comparten el denominador común de que la parte afectada por la doctrina litigó y perdió el asunto en el pleito anterior". Íd.

[47] Millán v. Caribe Motors Corp., 83 D.P.R. 494, 506-507 (1961); Aponte v. Roman, 145 D.P.R. 477, 488-489 (1998).

previamente el asunto y (2) no ha resultado ser la parte perdidosa en un litigio anterior".[48]

Establecido lo anterior, urge examinar algunos principios esenciales de la figura jurídica de la filiación. Veamos.

**B. La filiación.**

*1. Conceptos generales.*

Como bien articulamos en Castro Torres v. Negrón Soto, "[l]a filiación es el estado civil de la persona, determinado por la situación que, dentro de una familia, le asigna el haber sido engendrada en ella o el estar en ella en virtud de la adopción o de otro hecho legalmente suficiente al efecto".[49]

De la transcrita definición se desprende que la institución civil de la filiación se manifiesta a través de dos realidades fundamentales: la biológica y la jurídica.[50] Como bien detallan Díez-Picazo y Gullón, "[i]nicialmente, la filiación es un *hecho biológico* y consiste en que una persona ha sido engendrada o procreada por otra".[51] Posteriormente, nuestro ordenamiento jurídico recoge este hecho biológico y lo regula mediante la distribución de derechos y obligaciones entre los

---

[48] P.R. Wire Prod. v. C. Crespo & Assoc., supra, pág. 153.

[49] Castro Torres v. Negrón Soto, 159 D.P.R. 568, 579-580 (2003).

[50] J. Castán Tobeñas, Derecho Civil Español, Común y Foral, Madrid, 10ma ed., Ed. Reus S.A., T. 5, Vol. II, 1995, págs. 15-17. Véase, también, Mayol v. Torres, 164 D.P.R. 517, 529 (2005).

[51] (Énfasis nuestro.) L. Díez-Picazo y A. Gullón, Sistema de Derecho Civil, Madrid, 5ta ed., Ed. Tecnos, S.A., Vol. IV, 1989, pág. 247.

progenitores y los seres procreados por ellos.[52] Concretamente, es esta regulación del hecho biológico la que caracteriza a la filiación jurídica.

Pese a lo anterior, resulta imperativo tener presente que en ocasiones la relación biológica de la filiación no siempre coincide con la relación jurídica.[53] Como bien hemos recalcado en pronunciamientos anteriores, "[l]a filiación no es... necesariamente una situación derivada de un hecho biológico. De algún modo puede decirse que una cosa es ser padre y otra cosa ser progenitor. ... Padre y progenitor no son sinónimos. Padre contiene una carga de sentido socio-cultural y jurídico de la que carece el término progenitor".[54]

---

[52] Íd. Véase, también, Sánchez Encarnación v. Sánchez Brunet, 154 D.P.R. 645, 660 (2001).

En Mayol v. Torres, supra, págs. 529-530, abundamos sobre la distinción entre la filiación biológica y la jurídica de la manera siguiente:

Del hecho de que toda persona deba la existencia a su procreación o generación por un hombre y una mujer deriva su filiación (biológica) respecto de sus progenitores, y también su filiación jurídica, expresión para el Derecho, en línea de principio, de aquella relación biológica. De ese hecho jurídico de la filiación deriva luego la relación jurídica de filiación (de paternidad/maternidad, vista desde el lado de los progenitores), entendida como la existente entre generantes y generados, padres e hijos con el conjunto de derechos, deberes, funciones y, en general, relaciones, que los vincula en una de las más ricas y complejas instituciones jurídicas y humanas que el Derecho contempla.

[53] J.L. Lacruz Berdejo y otros, Elementos de Derecho Civil: Familia, (J. Rams, ed.), 2da ed., Madrid, Ed. Dykinson, 2005, Vol. IV, pág. 307. Véase, también, Sánchez Encarnación v. Sánchez Brunet, supra, pág. 661.

[54] Calo Morales v. Cartagena Calo, 129 D.P.R. 102, 112 (1991), citando a, L. Díez-Picazo y A. Gullón Ponce de León, Sistema de Derecho Civil, 3ra ed. rev., Madrid, Ed. Tecnos, 1983, T. IV, pág. 314. Véase, también, Sánchez Encarnación v. Sánchez Brunet, supra, pág. 661.

Más bien, hemos aseverado que la relación filiatoria puede catalogarse como una relación fundamentalmente jurídica "que requiere de una serie de criterios para establecerse. De estos criterios, los biológicos son los básicos, aunque éstos no siempre entran en acción".[55]

Abundando en lo anterior, el distinguido profesor Raúl Serrano Geyls comentó lo siguiente:

> Por un lado, la relación jurídica de parentesco presupone la previa identificación de la relación biológica, pero a veces eso no es de fácil comprobación, ya sea porque no se conoce quién es la madre o el padre, o porque hay más de una persona a quien se le podría identificar como tal. En otras ocasiones, aunque se sepa quiénes son los padres, la ley puede no darle eficacia jurídica al hecho del parentesco biológico, y así niega los derechos y obligaciones que de ordinario emanarían del mismo.[56]

El referido desfase nace de la riqueza y complejidad que entraña la filiación jurídica ante el mero dato biológico,

> en cuanto categoría jurídica y social que es y en la que se integran elementos afectivos, volitivos, sociales, formales, etc.; destacan en ella, además, unos roles importantes que la sociedad y el Derecho confieren a los protagonistas de dicha relación, donde lo funcional y el papel social tienen a veces mayor trascendencia que el elemento natural o biológico.[57]

---

[55] Castro Torres v. Negrón Soto, supra, pág. 580.

[56] R. Serrano Geyls, Derecho de Familia de Puerto Rico y Legislación Comparada, Ed. Universidad Interamericana de Puerto Rico, Vol. II, 2002, pág. 886.
   Claro está, a pesar de existir la posibilidad de que la filiación jurídica no sea un reflejo de la filiación biológica, es importante señalar que el Derecho puertorriqueño "se empeña en apoyar la paternidad jurídica en la biológica y hace los máximos esfuerzos porque ambos conceptos concuerden". (Citaciones internas omitidas) Calo Morales v. Cartagena Calo, supra, pág. 111.

[57] J.L. Lacruz Berdejo y otros, op. cit., pág. 307.

Apoyándonos en los principios generales hasta aquí esbozados, pasemos a discutir las clases de filiación existentes en nuestro ordenamiento legal y los mecanismos jurídicos disponibles para su fijación.

**2. Las clases de filiación y los medios para su determinación.**

***i. La filiación natural.***

Esencialmente, todo tipo de filiación puede tener lugar (1) por la naturaleza o (2) por la adopción.[58] La primera modalidad, la natural, implica la existencia de un vínculo biológico.[59] Este modo de filiación se bifurca, a su vez, en dos modalidades adicionales: (1) la matrimonial y (2) la extramatrimonial.[60]

"La *filiación matrimonial* es, como su propio nombre indica, aquélla surgida por la generación o concepción dentro del matrimonio".[61] Esta vertiente nace de una presunción controvertible, instaurada por el Art. 113 del Código Civil de Puerto Rico,[62] el cual dispone que "[s]e

---

[58] R.E. Ortega-Vélez, La filiación: apuntes y jurisprudencia, San Juan, Ed. Scisco, 1997, pág. 1. Véanse, también: J. Puig Brutau, Fundamentos de Derecho Civil, T. IV, págs. 188-189. (Interpretando el Art. 108 del Código Civil español, según fue reformulado en el 1981); J. Castán Tobeñas, *op. cit.*, pág. 20.

[59] J.L. Lacruz Berdejo y otros, *op. cit.*, pág. 312. Véanse, también: Sánchez Encarnación v. Sánchez Brunet, supra, pág. 662; Almodóvar v. Mendez Román, 125 D.P.R. 218, 235 (1990).

[60] R.E. Ortega-Vélez, *op. cit.*, pág. 1. Véanse, también: Castro Torres v. Negrón Soto, supra, pág. 583; Almodóvar v. Méndez Román, supra, pág. 235.

[61] (Énfasis nuestro.) R.E. Ortega-Vélez, *op. cit.*, pág. 17. Véase, también, Almodóvar v. Méndez Román, supra, pág. 235.

[62] 31 L.P.R.A. secs. 461. Véase, también, Almodóvar v. Méndez Román, supra, pág. 235.

presumen hijos del marido de la mujer casada los nacidos durante el matrimonio y los nacidos antes de los trescientos días siguientes a su disolución".[63]

Lo anterior es cónsono con la norma civilista *pater vero is est quem nuptiae demostrant*, la cual establece que el padre de toda criatura lo es el hombre casado con la madre del hijo o la hija nacida.[64] El uso de esta presunción en la determinación filial matrimonial encuentra su razón de ser en la dificultad práctica de determinar quién es el padre de un ser humano.[65] Contrario a la maternidad, la que siempre puede determinarse con tan sólo probar que la mujer ha alumbrado y que el hijo o la hija nacida procede de ese alumbramiento (*mater semper certa est*), resulta imposible concretizar a modo cierto la paternidad de una criatura (*pater semper incertus*).[66]

Ante esa incertidumbre, la presunción discutida representa el medio más idóneo para concretizar

---

[63] Íd. "Igualmente es legítimo el hijo nacido dentro de los ciento ochenta (180) días siguientes a la celebración del matrimonio, si el marido no impugnare su legitimidad". Art. 114 del Código Civil, 31 L.P.R.A. sec. 462.

Por otro lado, para que opere la presunción establecida por el Art. 113 del Código Civil, *supra*, será necesaria la concurrencia de los siguientes elementos: que se acredite la maternidad; que exista un vínculo matrimonial entre la madre y el hombre a quien se le atribuye la paternidad, y que el nacimiento ocurra luego de celebrarse el matrimonio, pero antes de los trescientos días de éste haber sido disuelto. Véase, Castro Torres v. Negrón Soto, supra, pág. 610 (Opinión Disidente de la Juez Asociada Señora Naveira de Rodón).

[64] L. Díez-Picazo y A. Gullón, op. cit., pág. 254. Véanse, también: Calo Morales v. Cartagena Calo, supra, págs. 115-116; Almodóvar v. Mendez Román, supra, págs. 235-236.

[65] Íd. Véanse, también: Calo Morales v. Cartagena Calo, supra, págs. 112-113; Ramos v. Marrero, 116 D.P.R. 357, 360 (1985).

[66] Íd.

jurídicamente dicho aspecto. Sólo así nuestro ordenamiento jurídico logra fomentar la defensa de la paz familiar; reducir, en la medida de lo posible, el número de eventuales litigios;[67] y, desde el nacimiento, asignarle padres ciertos a los hijos.[68]

Cuando no existe tal vínculo matrimonial, entonces será procedente invocar las normas *de la filiación extramatrimonial*. La referida modalidad no goza de la presunción de paternidad instaurada por nuestro Código Civil a favor de la filiación matrimonial.[69] Más bien, su determinación dependerá (1) del reconocimiento voluntario efectuado por el padre biológico[70] o (2) del decreto judicial resultante de una acción de reconocimiento forzoso instada por alguien legitimado para ello.[71]

Con relación al primero de estos medios, el reconocimiento voluntario, basta decir que el mismo "[c]onsiste de una admisión del hecho de la paternidad (o

---

[67] Íd.

[68] R. Serrano Geyls, *op. cit.*, págs. 910-911.

[69] Íd., pág. 963 ("el hijo de matrimonio nace con una presunción de filiación que le otorga la ley, que sólo pierde por las causas y mediante los procedimientos pertinentes, pero el hijo matrimonial nace sin esa presunción y tiene que buscar su filiación, si ese fuere su deseo, conforme a las pruebas y procedimientos establecidos por ley".) Véase, también, Sánchez Encarnación v. Sánchez Brunet, supra, pág. 664.

[70] Almodóvar v. Méndez Román, supra, págs. 236-237 y 248-249.

[71] R.E. Ortega-Vélez, *op. cit.*, pág. 37. Véase, también, R. Serrano Geyls, *op. cit.*, pág. 963 ("La filiación extramatrimonial se establece por dos medios: el reconocimiento voluntario hecho por los padres o el reconocimiento forzoso o acción de filiación que, como su nombre indica, nace de una sentencia judicial que establece la filiación solicitada".) Véanse, también: Castro Torres v. Negrón Soto, supra, pág. 584; Rivera Báez v. Jaume Andújar, 157 D.P.R. 562, 572 (2002).

maternidad) que hace el progenitor, la cual permite establecer el estado civil del hijo".[72]  Hemos indicado en el pasado que "el reconocimiento es el medio más importante para determinar la filiación matrimonial",[73] el cual se caracteriza por ser un acto individual, personalísimo, unilateral, formal, puro e irrevocable.[74]

Una vez efectuado el reconocimiento, "[q]ueda así pues determinada la filiación por la afirmación del progenitor mediante un acto jurídico, 'cuyo contenido implícito o explícito es la declaración de que ha existido el hecho biológico de la procreación del que ha nacido el hijo sobre el que recae el reconocimiento'".[75]

Relativo al segundo medio mencionado, el decreto judicial de filiación, amerita indicar que éste "presupone un reconocimiento forzoso mediante: primero, una reclamación judicial de filiación; segundo, prueba del hecho filiatorio; y, tercero, sentencia al respecto declarando la filiación".[76]

---

[72] Íd., pág. 42.  Según el Art. 113 del Código Civil, "[e]l reconocimiento voluntario crea una presunción de paternidad a favor del reconocedor".  31 L.P.R.A. sec. 461.  Para una discusión exhaustiva sobre el contenido y la naturaleza del reconocimiento voluntario, refiérase a Almodóvar v. Méndez Román, supra, págs. 238-240.

[73] Sánchez Encarnación v. Sánchez Brunet, supra, pág. 664.

[74] Almodóvar v. Méndez Román, supra, págs. 237-238.

[75] (Citaciones internas omitidas.) Sánchez Encarnación v. Sánchez Brunet, supra, pág. 664.

[76] R.E. Ortega-Vélez, op. cit., pág. 44.  Claro está, aunque hemos establecido que existen dos presunciones de paternidad –la que establece el Art. 113 del Código Civil, 31 L.P.R.A. sec. 461, que consiste en suponerlos hijos del marido, y la presunción derivada del reconocimiento que los supone hijos del reconocedor-, es

El decreto judicial de filiación puede instarse mediante una acción civil ordinaria al amparo del Art. 125 del Código Civil de Puerto Rico.[77] En lo pertinente, esta acción de reconocimiento forzoso podrá ejercitarse durante la vida del presunto padre, o un año después de su muerte, salvo: (1) que el padre o la madre hubiesen fallecido durante la menor edad del hijo, en cuyo caso se podría deducir la acción antes de que transcurran los primeros cuatro años de su mayor edad; y (2) que luego de la muerte del padre o de la madre apareciere algún documento del que antes no se hubiese tenido noticia, en el que reconozcan expresamente al hijo, en cuyo caso deberá deducirse la acción dentro de los seis meses siguientes al referido

---

imprescindible tener presente que ambas surten iguales efectos. Castro Torres v. Negrón Soto, supra, pág. 585.

[77] Art. 125 del Código Civil de Puerto Rico, 31 L.P.R.A. sec. 504. En lo pertinente, el citado articulado dispone que "[e]l padre está obligado a reconocer al hijo natural: ... (4) [c]uando el hijo pueda presentar cualquier prueba auténtica de su paternidad".

Además, cuando la parte afectada resulta ser un menor de edad, el Art. 131 del Código Penal de Puerto Rico tipifica el delito del incumplimiento de la obligación alimentaria, el cual permite la resolución colateral de todo reclamo de paternidad. 33 L.P.R.A sec. 4759. Según dispusimos en Poll Sella v. Lugo, 107 D.P.R. 540, 546-547 (1978), interpretando el derogado Art. 158 del Código Penal de 1974, la disposición legal indicada goza de una naturaleza mixta –penal y civil- la cual requiere probar la paternidad del sujeto activo para fines de establecer uno de los elementos del delito. Dora Nevares Muñiz, Nuevo Código Penal de Puerto Rico, San Juan, Instituto para el Desarrollo del Derecho, Inc., 2008, págs. 173-177. Coetáneamente, dicha prueba sirve como una determinación de paternidad, equiparable con el resultado de una acción civil filiatoria, que permite la inscripción en el registro demográfico de que el menor es hijo del acusado.

Por otro lado, la Ley Orgánica de la Administración para el Sustento de Menores, Ley Núm. 5 de 30 de diciembre de 1986, según enmendada, provee en su Sec. V, Art. 11, un procedimiento administrativo expedito para la determinación de filiación con el propósito de establecer una pensión alimentaria, al igual que la posibilidad de un reconocimiento voluntario de filiación vía un certificado de paternidad. Véase, 8 L.P.R.A. sec. 510. Véase, también, Vincenti Damiani v. Saldaña Acha, 157 D.P.R. 37 (2002).

hallazgo.[78]  Como  bien  hemos  expresado  en  numerables ocasiones,  es  importante  tener  presente  que  los  referidos términos son de caducidad.[79]

Ahora bien, aunque nuestro ordenamiento legal regula de modo distinto la determinación oficial de cada tipo de filiación,  al  igual  que  las  diferentes  acciones  de reclamación e impugnación para cada una de ellas,[80] es imperativo resaltar que el que un hijo sea matrimonial o extramatrimonial no implica un trato distinto con relación a sus derechos y obligaciones en función de sus padres y familia.[81]  Como bien indicamos en Almodóvar v. Méndez Román, "nuestro  ordenamiento  [les]  atribuye  los  mismos derechos,      facultades,      obligaciones,      deberes, incompatibilidades    y    prohibiciones    dentro    de    la organización de la familia y la sociedad".[82]  En fin, no

_____

[78] Art. 126 del Código Civil de Puerto Rico, 31 L.P.R.A. sec. 505. Véase, también, Calo Morales v. Cartagena Calo, supra, pág. 120.

[79] R. Serrano Geyls, op. cit., pág. 1047.  Véase, también, Calo Morales v. Cartagena Calo, supra, pág. 121.  La caducidad es la decadencia de un derecho, o su pérdida, por no haber cumplido la formalidad o condición exigida por ley en un plazo determinado.  Esta pérdida del Derecho se produce automáticamente por no ejercitarse en el transcurso de dicho plazo.  Castro Torres v. Negrón Soto, supra, pág. 596, nota al calce Núm. 25.

[80] Sánchez Encarnación v. Sánchez Brunet, supra, pág. 667 ("Ahora bien, aun cuando ante la ley los hijos tienen los mismos derechos, sin importar las circunstancias en las que se haya dado su nacimiento, es menester 'distinguir' entre ellos, ello únicamente con el fin de precisar que la acción de impugnación de paternidad o filiación legítima es aquella mediante la cual se cuestiona la paternidad de los hijos matrimoniales.  Por otra parte, no hay tal acción de impugnación de paternidad extramatrimonial, sino la acción, ya reiterada por este Foro, catalogada por nuestro ordenamiento como la de impugnación de reconocimiento").

[81] Almodóvar v. Méndez Román, 125 D.P.R. 218, 234-235 (1990).

[82] Íd., pág. 234.  Véase, también, Castro Torres v. Negrón Soto, supra, pág. 582.

importa la manera en que un individuo adquirió su estado o condición de hijo, ya sea "desde el momento mismo del nacimiento o desde el momento del reconocimiento[,] no hay duda de que una vez adquirida tal condición se trata de 'un mismo y único grupo: hijos'".[83]

Habiendo examinado los aspectos medulares de la filiación natural, corresponde dilucidar algunos conceptos generales ligados a la figura de la filiación adoptiva.

### ii. La filiación adoptiva: su fijación e impugnación.

La segunda vertiente de la institución de la filiación, la adoptiva, se define como "un acto jurídico solemne, el cual supone la ruptura total del vínculo jurídico-familiar de una persona con su parentela biológica y la consecuente filiación de ésta con aquel o aquellos que han expresado la voluntad de que legalmente sea su hijo".[84] Esta modalidad de la filiación prescinde del fundamento biológico, permitiendo así que, por ficción de ley, el acto jurídico sustituya el hecho natural,[85] con iguales deberes y obligaciones jurídicas y sociales que aquellas existentes en la filiación natural.[86] Claro está, a pesar de la equiparación reseñada, la filiación adoptiva continúa siendo, "en principio,... una creación del

---

[83] Castro Torres v. Negrón Soto, supra, pág. 585.

[84] López Rivera v. E.L.A., 165 D.P.R. 280, 299 (2005); Zapata Saavedra v. Zapata Martínez, 156 D.P.R. 278, 286 (2002).

[85] J.L. Lacruz Berdejo y otros, op. cit., pág. 312.

[86] López Rivera v. E.L.A., supra, pág. 299; Zapata Saavedra v. Zapata Martínez, supra, pág. 286.

Derecho [que *imita*] a la naturaleza y [*suple*] deficiencias personales de ésta".[87]

**a. El procedimiento de adopción previo a la reforma legislativa de 1995.**

Al momento de la adopción del señor Beníquez Méndez, los aspectos procesales y sustantivos de la institución de la filiación adoptiva se regían por el Código de Enjuiciamiento Civil (hoy Ley de Procedimientos Legales Especiales), 32 L.P.R.A. sec. 2691 *et seq.*, y el Código Civil de Puerto Rico, 31 L.P.R.A. sec. 531 *et seq.*, respectivamente. Ambos estatutos subsistían a la luz de la reforma legislativa en materia de adopción que instauraron las Leyes Núm. 85 y 86 de 15 de junio de 1953, previo a la adopción de las Leyes Núm. 8 y 9 de 19 de enero de 1995, y la Ley Núm. 186 de 18 de diciembre de 2009.

Los aspectos sustantivos que se debían cumplir para obtener un decreto de adopción estaban regulados por los Arts. 130 al 135 del Código Civil de Puerto Rico.[88] Esos artículos disponían sobre los requisitos del adoptante, quiénes no podían ser adoptantes, quiénes no podían ser adoptados, la adopción conjunta o individual en caso de matrimonios, así como las personas llamadas a consentir a

---

[87] J.L. Lacruz Berdejo y otros, *op. cit.*, pág. 307.

[88] 31 L.P.R.A. secs. 531-536. Véanse, además: <u>Martínez Soria v. Proc. Especial de Relaciones de la Familia</u>, <u>supra</u>, pág. 920; <u>Ex Parte Warren</u>, 92 D.P.R. 299 (1965).

la adopción.[89] Una vez superados esos requisitos de carácter sustantivo, entonces la ley regulaba detallada y específicamente el procedimiento para obtener la autorización judicial para una adopción.[90] En M.J.C.A., Menor v. J.L.E.M., Menor, señalamos que "[l]os requisitos sustantivos para ser adoptante *son jurisdiccionales. Su incumplimiento priva de jurisdicción al tribunal*".[91] Es decir, si se incumplía con los requisitos sustantivos que exigían los Arts. 130 al 135 del Código Civil, *supra*, no se superaba el filtro para que el tribunal tuviera la potestad de otorgar la autorización judicial a la adopción.

Procesalmente, la filiación adoptiva se consumaba por virtud de un decreto judicial originado por la presentación de una solicitud jurada de adopción.[92] La referida solicitud debía contener todas las alegaciones que sirviesen de base para la determinación de la

---

[89] Amerita señalar que al momento de los hechos bajo examen, el Código Civil de Puerto Rico, en su Art. 135, proveía que toda adopción requería el consentimiento: del adoptado, si era mayor de edad; de los padres o tutores de un menor de edad o incapacitado; y del adoptado, si era mayor de 10 años de edad. 32 L.P.R.A. sec. 536 (derogado) (ed. 1967). Siendo éstas las personas afectadas por un decreto de adopción que no cuente con su consentimiento, o que el mismo esté viciado, resulta lógico concluir que éstos constituyen las personas legitimadas a instar la acción de impugnación de adopción antes discutida.

[90] M.J.C.A., Menor v. J.L.E.M., Menor, supra, pág. 921.

[91] Íd. (Énfasis en el original.)

[92] Art. 612 del Código de Enjuiciamiento Civil, 32 L.P.R.A. sec. 2691 (derogado) (ed. 1968). En la actualidad, las partes interesadas en adoptar deberán presentar una petición de adopción la cual cumpla con los requisitos sustantivos esbozados en los Arts. 130 al 138 de nuestro Código Civil. 31 L.P.R.A. secs. 531-539. A su vez, será imprescindible que se cumpla con los elementos procesales esbozados en el Art. 143 del Código Civil, 31 L.P.R.A. sec. 535, y en las secciones

conveniencia de la adopción y debía ser notificada al fiscal de distrito correspondiente.[93]

Posterior a la presentación de la referida solicitud, y sólo en casos en que el adoptado fuese un menor de edad, el tribunal venía obligado a ordenar a la entonces dependencia de Bienestar Público a celebrar un estudio social referente a la solicitud de adopción incoada, cuyo contenido atendiera determinados factores dispuestos por ley y recomendase o no la adopción solicitada.[94] Una vez la dependencia de Bienestar Público culminara el estudio indicado, debía entregar al tribunal un escrito referente al mismo.[95] Recibido el informe, el otrora Tribunal Superior celebraba vistas en cámara con la intervención del fiscal, los adoptantes, los adoptados, *los padres biológicos* –cuando su presencia era necesaria-, los testigos y algún consejero o representante de la dependencia del Bienestar Público.[96]

---

2699 a 2699t del Título 32 de las Leyes de Puerto Rico Anotadas, según fueron enmendadas por la Ley Núm. 186 de 18 de diciembre de 2009.

[93] Art. 612 del Código de Enjuiciamiento Civil, 32 L.P.R.A. sec. 2691 (derogado) (ed. 1968).

[94] Art. 613 del Código de Enjuiciamiento Civil, 32 L.P.R.A. sec. 2692 (derogado) (ed. 1968), según fue enmendado por la Ley Núm. 53 de 22 de mayo de 1968, Véase, 32 L.P.R.A. sec. 2692 (derogado) (ed. 1990). El referido articulado exigía que el estudio social incluyera, además de las circunstancias de la petición, el historial social de los solicitantes, del menor o incapacitado y de sus padres biológicos; los planes de los solicitantes para con el menor o incapacitado y cualesquiera otros hechos pertinentes a las relaciones entre el menor o incapacitado y los solicitantes y entre el menor o incapacitado y sus padres biológicos. Íd.

[95] Íd.

[96] Art. 613D del Código de Enjuiciamiento Civil, 32 L.P.R.A. sec. 2696 (derogado) (ed. 1990).

Si el Tribunal autorizaba la adopción solicitada, el secretario del Tribunal remitía una copia certificada de la resolución dictada en el caso a la División del Bienestar Público y a la División del Registro Demográfico y Estadísticas Vitales del Departamento de Salud.[97] Una vez el decreto de adopción advenía final y firme, "[cesaban] todos los derechos, deberes y obligaciones del adoptado en su familia natural o biológica y los de ésta con el adoptado".[98] Consecuentemente, el ordenamiento legal consideraba al adoptado como hijo del adoptante, con todas las derivaciones legales que tal aseveración implicaba.[99]

**b. La impugnación de un decreto de adopción.**

Ahora bien, al momento de la adopción del señor Beníquez Méndez, nuestro derecho de adopción proveía a una parte legitimada para ello la posibilidad de incoar una acción de nulidad en contra de un decreto de adopción.[100] Así, el Art. 613E del Código de Enjuiciamiento Civil, promulgado por la Ley de 1953, proveía lo siguiente: "Transcurrido el periodo de dos (2) años desde la fecha de la resolución del tribunal autorizando la adopción, cualquier irregularidad en los procedimientos se

---

[97] Art. 613C del Código de Enjuiciamiento Civil, 32 L.P.R.A. sec. 2695 (derogado) (ed. 1990).

[98] Art. 133 del Código Civil de Puerto Rico, 31 L.P.R.A. sec. 534 (derogado) (ed. 1967).

[99] Ex parte J.A.A, 104 D.P.R. 551, 554 y 556; Art. 132 del Código Civil de Puerto Rico, 31 L.P.R.A. sec. 533 (derogado) (ed. 1967).

[100] R. Serrano Geyls, *op. cit.*, pág. 1187.

considerará subsanada y la validez de la adopción no podrá ser atacada directa ni colateralmente en ningún procedimiento".[101]

Según interpretó el profesor Serrano Geyls, el citado estatuto no representaba una acción de revocación de la adopción.[102] Más bien, éste disponía de una acción ambigua de nulidad, la cual estaba limitada únicamente a aquellas *irregularidades* en el procedimiento que fuesen constatadas por los tribunales.[103] Esta clarificación implicaba que los adoptantes y adoptados no gozaban de la facultad de poder dejar sin efecto, unilateral o bilateralmente, la adopción consumada por haber experimentado un cambio de criterio con referencia a su deseabilidad de haber consentido a la adopción.[104]

En el 2000, en <u>Martínez Soria v. Proc. Especial de Relaciones de la Familia</u>,[105] este Tribunal se enfrentó por primera vez a una de las controversias que hoy nos ocupan, a saber: si era posible impugnar exitosamente un decreto de adopción a pesar de haber transcurrido el periodo de dos años que proveía la Ley de 1953 para la acción de nulidad antes explicada.

---

[101] Art. 613E del Código de Enjuiciamiento Civil, 32 L.P.R.A. sec. 2697 (derogado) (ed. 1990).
[102] R. Serrano Geyls, *op. cit.*, pág. 1187.

[103] Íd.

[104] Íd.

[105] 151 D.P.R. 41 (2000) (Sentencia).

Aunque ninguna ponencia en este caso alcanzó los votos necesarios para convertirse en opinión del Tribunal, hemos analizado los fundamentos variados de la opinión disidente así como las distintas opiniones concurrentes que se emitieron con el propósito de lograr una interpretación cónsona con la verdadera intención que tuvo el legislador al incluir el Art. 613E en el Código de Enjuiciamiento Civil en el año 1953.[106]

Los hechos particulares de aquel caso quedaban configurados por una joven adoptada a sus diecisiete años de edad por el esposo de su madre natural.[107] Cuando alcanzó la mayoría de edad –dos años y tres meses después de decretarse su adopción– la joven impugnó su adopción mediante una moción al efecto ante el Tribunal de Primera Instancia.[108] Como fundamento para su petición, alegó que fue víctima de abuso sexual desde que tenía 13 años de edad por parte de quien posteriormente se convirtió en su padre adoptivo.[109]

En oposición a su petitorio, la Procuradora Especial de Relaciones de Familia alegó que la impugnación del decreto de adopción era improcedente por haber

---

[106] En el referido caso los Jueces Asociados Señor Negrón García, Señor Fuster Berlingeri y la Juez Asociada Señora Naveira de Rodón, suscribieron opiniones concurrentes separadas. Los Jueces Asociados Señores Rebollo López y Hernández Denton concurrieron con el resultado y el Juez Asociado Señor Corrada Del Río disintió con una opinión escrita.

[107] Íd., págs. 41-42.

[108] Íd., pág. 42.

[109] Íd.

transcurrido un periodo en exceso de los dos años provistos por el derogado Art. 613E del Código de Enjuiciamiento Civil para esa clase de acción.[110] Luego de varios trámites procesales, el Tribunal de Primera Instancia concedió la solicitud de la peticionaria y dejó sin efecto su decreto de adopción.[111] Fundamentó su decisión en que el término de caducidad de dos años que estableció el Art. 613E del Código de Enjuiciamiento Civil comenzaba a transcurrir a partir de la fecha en que un menor adoptado advenía a la mayoría de edad.[112]

Inconforme con el dictamen del foro primario, la Procuradora acudió en alzada ante el otrora Tribunal de Circuito de Apelaciones reafirmando los argumentos que esbozó originalmente ante el Tribunal de Primera Instancia.[113] El foro apelativo intermedio falló a su favor.[114] Una vez la controversia arribó ante esta Curia, resolvimos vía Sentencia, y por distintos fundamentos, que el Tribunal de Apelaciones erró y que procedía devolver el caso al Tribunal de Primera Instancia para dilucidar en una vista evidenciaria las alegaciones vertidas por la joven que impugnaba su adopción.[115]

---

[110] Íd., pág. 43.

[111] Íd.

[112] Martínez Soria v. Proc. Especial de Relaciones de la Familia, supra, pág. 44.

[113] Íd.

[114] Íd., págs. 44-45.

[115] Íd., págs. 46-47.

La opinión concurrente de la entonces Jueza Asociada señora Naveira de Rodón se concentró en realizar una distinción entre los requisitos procesales y sustantivos de la adopción para propósitos de analizar cuándo un decreto de adopción es nulo o anulable. Amparándose en lo expuesto en el caso M.J.C.A., Menor v. J.L.E.M., Menor, *supra*, en el que señalamos que el incumplimiento con los requisitos sustantivos de la adopción privaban de jurisdicción al Tribunal, la Jueza asociada concluyó que cuando la adopción se impugna por haberse dictado en violación de los requisitos jurisdiccionales del procedimiento de adopción, procede declarar la *nulidad* del decreto de adopción, ya que éste se aprobó sin que el Tribunal tuviera jurisdicción y representa un acto jurídico inexistente.[116] Debido a que la nulidad acarrea la inexistencia del decreto de adopción, ésta "no se deja llevar por término... de caducidad alguno puesto que falta jurisdicción".[117]

Además, la Jueza Asociada era del criterio que las normas generales sobre la nulidad y anulabilidad de los negocios jurídicos eran de aplicación al ámbito de la adopción, teniendo presente "las debidas adaptaciones a la especial naturaleza del acto de adopción".[118] La Jueza entendía que el requisito sustantivo del consentimiento de

---

[116] Íd., págs. 62 y 63.

[117] Íd., pág. 63.

[118] (Citaciones internas omitidas.) Íd., págs. 60-61.

las personas incluidas en el Art. 135 del Código Civil, *supra*, estaba sujeto a la doctrina de los vicios del consentimiento por motivo del error, el dolo, la intimidación y la violencia.[119] Por ello, cuando se pudiera probar que en efecto hubo consentimiento a la adopción, pero el mismo estuvo viciado, entonces el procedimiento de adopción era anulable.[120]

El Juez Asociado señor Negrón García expuso, de entrada, que los hijos adoptivos están protegidos por el Art. II, Sec. 1, de la Constitución de Puerto Rico que prohíbe el discrimen por nacimiento.[121] El Juez Asociado circunscribió la controversia del caso en "el derecho que tiene todo hijo a esclarecer su origen, a saber, los factores, las circunstancias y los motivos que dieron lugar a su filiación".[122] Así, pues, utilizó ese fundamento para sostener que "[n]uestra Constitución no permite negarle a un hijo adoptivo el derecho que tiene un hijo biológico de dilucidar ante un tribunal de justicia las causas y el origen de su filiación".[123] Al equiparar la filiación biológica y adoptiva, sostuvo que no podía imponérsele a un hijo adoptado un término menor al que

---

[119] Íd., págs. 60-61.

[120] Íd., pág. 61.

[121] Íd., pág. 47.

[122] Íd.

[123] Íd.

tiene un hijo biológico al amparo del Art. 126 del Código Civil,[124] para impugnar su presunción de filiación.[125]

Entendió que en el caso ante él, la señorita Martínez Soria atacaba "precisamente el origen de su filiación por adopción".[126] En otras palabras, "deseaba esclarecer la situación que enmarcó su adopción y desenmascarar un alegado procedimiento fraudulento".[127] El Juez Asociado reconoció que la acción de la presunción de la paternidad y el recurso ante sí eran distintos, pero se apoyaban en un mismo fundamento: ennoblecer la verdad.[128]

En síntesis, concluyó que la acción de la señorita Martínez Soria "se apuntala[ba] en una dirección distinta a las incluidas en el aludido art. 613E del Código de Enjuiciamiento Civil".[129] Esto pues, si se probaban las alegaciones en torno a la agresión sexual por parte del padre adoptante, entonces "su petición de adopción sólo fue un subterfugio para continuar perpetuando un abuso que en nada contribuiría al bienestar de la peticionaria", por lo que "su petición sería una perjura y fraudulenta, y nula *ab initio*".[130] Finalmente, sugirió utilizar los

---

[124] 31 L.P.R.A. sec. 505

[125] Martínez Soria v. Proc. Especial de Relaciones de la Familia, supra, pág. 48.

[126] Íd., pág. 49.

[127] Íd.

[128] Íd.

[129] Íd., pág. 51.

[130] Íd., págs. 51-52.

remedios de la Regla 49.2 de Procedimiento Civil[131] para dilucidar el posible fraude que se configuró en la petición de adopción de la señorita Martínez Soria.[132]

Por su parte, el Juez Asociado señor Fuster Berlingeri entendió que el Art. 613E de la Ley de Procedimientos Legales Especiales, le permitía a la señorita Martínez Soria presentar la acción de nulidad. Tras realizar un recuento de los propósitos de la adopción, razonó que "la institución de la adopción existe para salvaguardar principalmente el interés *del adoptado*".[133] (Énfasis en el original.) De ahí que no se pueda utilizar la figura de la adopción para corromper y deformar esa institución.[134] Arguyó, además, que la adopción se considera perpetua, pero que tal irrevocabilidad "significa que la subsistencia del estado civil creado por la adopción no puede quedar a merced de un cambio de voluntad o resolución unilateral del adoptante, y tampoco de una anuencia entre las partes".[135] Ahora bien, analizó que lo anterior no significaba que la adopción tuviera "que subsistir *ad perpetum*".[136] Explicó que desde los tiempos de las Siete Partidas del Rey Don

---

[131] 32 L.P.R.A. Ap. III. Se refería a las Reglas de Procedimiento Civil de 1979 que eran las vigentes en aquel entonces.

[132] Íd., pág. 52.

[133] Íd., pág. 68.

[134] Íd., págs. 68-69.

[135] Íd., pág. 69.

[136] Íd.

Adolfo "El Sabio" "se reconoció que el vínculo entre adoptado y adoptante era susceptible de quebrantamiento".[137] Añadió que actualmente en España existe también la acción de impugnación de la adopción.

Al mismo tiempo, enfatizó en que "nuestra ley sobre adopción ha reconocido el carácter permanente y la naturaleza invulnerable que debe permear la institución, estableciéndose así un limitado término para el ejercicio de la acción de impugnación" en el Art. 613E de la Ley de Procedimientos Legales Especiales.[138] Asimismo, planteó que "[e]l establecimiento de este limitado período de dos (2) años refleja el propósito legislativo de preservar la seguridad jurídica y la estabilidad familiar, a los fines de fijar permanentemente una relación inmutable revestida de ciertas consecuencias jurídicas,… ,anulando, así la posibilidad de que el nuevo estado civil del hijo adoptivo quedara al libre arbitrio de los adoptantes, de él mismo, e incluso de ambos".[139]

De igual forma, el Juez Asociado Fuster Berlingeri creía que el mencionado artículo 613E tenía una laguna respecto "al sujeto que la impugna".[140] Basándose en el derecho de otras jurisdicciones que admiten la interrupción de los términos de caducidad en caso de

---

[137] Íd.

[138] Íd., pág. 70.

[139] Íd., pág. 71. Véase, además Valladares De Sabater v. Rivera Lazú, 89 D.P.R. 254, 261-262 (1963).

[140] Íd., pág. 72.

menores e incapacitados hasta que estos advengan a la mayoría de edad, el Juez concluyó que "la certeza e inmutabilidad del nuevo estado civil" debía "ceder ante el apremiante interés del Estado de proteger el derecho de los incapaces".[141] Por todo ello, afirmó que el término de caducidad de dos años dispuesto en el Art. 613E debía computarse desde el momento en que la hija adoptiva adviniera a la mayoría de edad.[142] Sin embargo, puntualizó que "[l]a anulación de la adopción… sólo procedería en casos de causas extremas como la de este caso, en los cuales no hay posibilidad real alguna de vida familiar entre el adoptante y la adoptada".[143]

Por último, en su opinión disidente, el Juez Asociado Señor Corrada del Río se apartó de la postura de los Jueces concurrentes y concluyó:

> El hecho de que el Art. 613E de la Ley de Procedimientos Legales Especiales, *supra*, establece el término de caducidad de dos (2) años para la impugnación de una adopción y que lo hace sin especial atención al sujeto que la impugna, significa que dicho término aplica *erga omnes*, sin que se reconozca por el Legislador excepción de clase alguna. No se trata de una laguna en el estatuto; se trata de un claro mandato estatutario a los efectos de que transcurridos dos (2) años de la adopción "[l]a validez de la adopción no podrá ser atacada directa ni colateralmente *en ningún procedimiento*".[144] [Énfasis en el original.]

---

[141] Íd., pág. 76; Serrano Geyls, *op. cit.*, pág. 1192.

[142] Íd., págs. 76-77.

[143] Íd., pág. 77.

[144] Íd., pág. 86.

Su postura se fundamentó principalmente en que "[a]brir las adopciones a una multiplicidad de acciones de impugnación, …, representa un grave riesgo a la certeza y permanencia de las relaciones paterno-filiales…".[145] Además, entendió que al permitirle a un hijo adoptivo que impugne su adopción por haber sido abusado sexualmente por su padre o madre adoptante se estaría "creando una causa de acción de impugnación a la paternidad adoptiva que una hija biológica no tiene contra su padre bajo las mismas circunstancias".[146]

Finalmente, sostuvo que la hija adoptiva no quedaba desprovista de remedio, pues tenía la potestad de desheredar a su padre por haber atentado contra su pudor, solicitar un cambio de nombre para no tener que utilizar el apellido del padre adoptante, iniciar una acción penal en su contra y, si es menor de edad, solicitar su emancipación si tiene más de dieciocho (18) años o reportarlo a las autoridades correspondientes.[147]

Consideramos que los hechos particulares que se dieron en el caso <u>Martínez Soria v. Proc. Especial de Relaciones de la Familia</u>, *supra*, llevaron a los Jueces a buscar una excepción para casos tan delicados y funestos como el que tuvieron ante su consideración. Pero no podemos derrotar la intención del legislador por lo

---

[145] Íd., págs. 86-87.

[146] Íd., pág. 87.

[147] Íd., págs. 92-93.

impresionante de unos hechos. Como señalamos en <u>Rivera Coll v. Tribunal Superior</u>, "el principio de que los estatutos sobre adopción deben ser interpretados liberalmente, a favor del adoptado… no puede conducirnos ni a violentar la intención legislativa, ni a consagrar absurdos".[148] Recordemos que la Ley Núm. 85 de 15 de junio de 1953 añadió el Art. 613E amparándose sustancialmente en la Ley Uniforme de Adopción de 1953.[149] Sabido es que "[c]uando un estatuto es copiado o adoptado de una ley extranjera o de otra jurisdicción, se presume que se adopta con la interpretación que se le ha dado hasta ese momento en la jurisdicción de donde procede".[150]

Unos tratadistas en la materia han expuesto que aunque el "Uniform Adoption Act" no fue apadrinado por muchos estados, representa la corriente en el derecho de adopción con relación a la anulación de las adopciones. La sección original del "Uniform Adoption Law" de 1953 refleja el intento de sus creadores de dar por terminados los decretos de adopción en favor del desarrollo y la

---

[148] 103 D.P.R. 325, 331 (1975).

[149] <i>Ex parte</i> Warren, <u>supra</u>, pág. 305, n. 7. Esa ley uniforme regulaba en su Sec. 17 las causas de anulación de la adopción. Específicamente, limitaba la anulación a los casos en los que el menor adoptado desarrollara, dentro de los dos años luego de la adopción, cualquier incapacidad o malignidad mental o física seria o permanente que fuera producto de una condición existente antes de la adopción y de la cual los padres adoptantes no tenían ningún conocimiento o notificación. Como vemos, la anulación de una adopción podía darse únicamente por razón de condiciones graves de salud del menor adoptado. <u>Handbook of the National Conference of Commissioners on Uniform State Laws and Proceedings of the Annual Conference Meeting in its Sixty-Second Year</u>, Boston, Massachusetts (Agosto 17-2,2 1953), págs. 221-222.

certidumbre del estatus familiar.[151]  Y aunque en Rivera
Coll v. Tribunal Superior, *supra*, señalamos que "[a]
partir del 15 de junio de 1953, con la aprobación de las
leyes Núm. 85 y Núm. 86 de ese año,..., tanto el
procedimiento para la adopción como la figura jurídica de
la adopción son el producto de nuestra autoctonía… [y por
tanto] recurrir a interpretaciones de estatutos foráneos,
por persuasivos que parezcan, resulta en futilidad", lo
cierto es que la correcta solución de la controversia debe
"depender de nuestra propia interpretación de la intención
legislativa al aprobarse las citadas leyes".[152]

Hemos realizado un análisis exhaustivo y detenido del
historial legislativo de la Ley Núm. 85 de 15 de junio de
1953, *supra*. Sin embargo, no encontramos discusión sobre
el Art. 613E, *supra*.

De un análisis del texto del Art. 613E observamos que
el legislador puertorriqueño, contrario a limitar las
causas de anulación, creó un estatuto no condicionado a
limitación alguna para impugnar la adopción antes de que
venciera el periodo de dos años desde que ésta fue
decretada. Después de esa fecha, entonces, "cualquier
irregularidad en los procedimientos se considerará
subsanada y la validez de la adopción no podrá ser

---

[150] R.E. Bernier y J.A. Cuevas Segarra, Aprobación e Interpretación de las Leyes en Puerto Rico, San Juan, Publicaciones JTS, Inc., 2da. ed., 1987, pág. 451.
[151] Anne Harlan Howard, Annulment of Adoption Decrees on Petition of Adoptive Parents, 22 J.Fam.L. 549 (1983-1984).

[152] Rivera Coll v. Tribunal Superior, supra, pág. 327.

atacada".[153] En estos mismos términos se expresó el reconocido profesor y tratadista puertorriqueño Efraín González Tejera al expresar que "[e]l referido artículo regula el problema relativo a la eficacia de la resolución que dicte el Tribunal en casos de adopción, limitando el plazo dentro del cual debe actuar el promovente que interese se declare su nulidad".[154] Explicó el profesor que

> [e]n primer lugar, [el art. 613E] lidia con causales de nulidad cuyo origen se encuentre en algún vicio del procedimiento. Culminar la adopción sin citar ni oír a los padres biológicos, o mediante citación por edictos cuando debió citarse personalmente al padre natural, no oír al adoptado menor de edad cuando debió oírsele, falta de estudio e informe del Departamento de Servicios Sociales (cuando se trata de la adopción de un menor o incapacitado), serían vicios del procedimiento para los cuales el citado artículo concede una acción, que debe ejercitarse dentro de los dos años de la adopción.[155]

Añade el profesor que a pesar de que el Art. 613E "no utiliza un lenguaje claro… **fija un periodo igual para atacar la adopción cuando se trate de vicios del consentimiento.**"[156] (Énfasis suplido.) Explicó que "[n]uestro ordenamiento legal no hace referencia a la revocación del consentimiento prestado para la futura adopción".[157] Por ello, para él resulta de ayuda la teoría

---

[153] Art. 613E, íd.

[154] Efraín González Tejera, Bienestar del Menor: señalamientos en torno a la patria potestad, custodia y adopción, 54 Rev. Jur. U.P.R. 409, 490 (1985).

[155] Íd.

[156] Íd.

[157] Íd., pág. 491.

general de las obligaciones, en cuanto a los vicios del consentimiento, así como la legislación y expresiones judiciales de otras jurisdicciones.[158] A modo de ejemplo, trajo los casos en los que los estatutos de algunos estados condicionaban la anulación de la adopción a defectos mentales del adoptado o a diferencias étnicas suscitadas con posterioridad entre el adoptado y sus padres adoptantes.[159] Sin embargo, es la opinión del autor que "toda paternidad tiene sus riesgos [;] no importan los cambios que con el tiempo se produzcan en el adoptado, la adopción debe ser irrevocable".[160]

En síntesis, aunque sin duda el Art. 613E contaba con múltiples deficiencias en su redacción, lo cierto es que para propósitos de nuestra controversia, tenemos que concluir que un cuestionamiento sobre la validez de una adopción por vicios del consentimiento está conceptualizado dentro del amplio lenguaje del Art. 613E de la Ley de Procedimientos Legales Especiales.[161]

---

[158] Íd. Hace referencia específicamente al Art. 1217 del Código Civil de Puerto Rico, 31 L.P.R.A. sec. 3404, que dispone que será anulable el consentimiento prestado por error, violencia intimidación o dolo, y a la interpretación que se le ha dado a esta figura.

[159] Íd.

[160] Íd. En cuanto a quiénes tendrían capacidad para iniciar un procedimiento de nulidad de la adopción, el autor opina que "[t]al como está redactado el Artículo 613E, parece que corre contra todos cuantos puedan ejercer la acción, sean mayores o menores de edad, por tratarse de un plazo de caducidad". Íd., págs. 492-493.

[161] El derecho de adopción sufrió varias reformas posterior a la derogación de la referida disposición legal. Así, mediante la reforma ejercida a nuestro derecho de adopción por conducto de las leyes 8 y 9, *supra*, de 1995, la Asamblea Legislativa clarificó en parte algunas de las interrogantes dejadas sin contestar por la Ley de 1953, *supra*.
    Particularmente, la Ley Núm. 9, *supra*, precisó la naturaleza irrevocable de un decreto de adopción (32 L.P.R.A. sec. 2699p (ed.

Teniendo presente el marco legal relacionado a la institución de la filiación natural y adoptiva, resta examinar la interrelación de ambas figuras en una sola causa de acción.

**C. *La relación entre la acción de impugnación de adopción y la reclamación judicial de filiación.***

Finalmente, debemos examinar cuáles son los efectos de una causa de acción que solicita la determinación de una filiación natural, posterior a la consumación y el perfeccionamiento de una filiación adoptiva. Específicamente, debemos preguntarnos si un hijo o una hija puede solicitar que un tribunal concretice cuál es su filiación natural, años después de haberse fijado su filiación adoptiva. De contestar la interrogante planteada en la afirmativa, procede entonces analizar cuáles son los efectos jurídicos que la subsiguiente determinación de una filiación natural conlleva en relación con la filiación adoptiva existente. Veamos.

---

2004)) y concretizó las circunstancias ante las cuales procedía una acción de *anulabilidad*, estableciendo, a su vez, un término de caducidad de un año para la referida acción (32 L.P.R.A. sec. 2699r (derogado) (ed. 2004)). Concretamente, el legislador dispuso en el Art. 18 de la Ley Núm. 9, *supra*, que "[s]er[í]a anulable el decreto de adopción cuando no se [hubiese] notificado a las partes que ten[ían] derecho a notificación a tenor con lo [que disponía el Código de Enjuiciamiento Civil], *o cuando [hubiesen] mediado vicios del consentimiento del padre o madre biológicos,* o fraude al tribunal". 32 L.P.R.A. sec. 2699q (derogado) (ed. 2004).

Finalmente, en el año 2009, la Asamblea Legislativa incursionó en una nueva reformulación de nuestras normas de adopción. Así, mediante la Sec. 38 de la Ley Núm. 186 de 18 de diciembre de 2009, se enmendó el Art. 613O de la Ley Núm. 9, *supra*, reduciéndose el término de caducidad disponible para que una parte con legitimidad para ello inste una acción de anulabilidad de adopción. Específicamente, ahora "[l]a acción sobre anulabilidad de la adopción decretada tiene que ser instada dentro del término de caducidad de seis (6) meses a partir de la fecha en que el decreto de adopción advenga final y firme", en lugar del año que antes proveía la Ley Núm. 9, *supra*.

En nuestro ordenamiento legal rige la norma de la incompatibilidad de filiaciones contradictorias. Según la indicada doctrina legal, resulta "imposible tener dos filiaciones [naturales] o dos padres [o madres biológicos] al mismo tiempo".[162] Como resultado, "no es posible determinar una nueva filiación [natural] en tanto exista... otra [filiación natural] contradictoria".[163]

En vista de lo anterior, hasta que no se impugne exitosamente la filiación natural contradictoria, no procede el reconocimiento de la verdadera filiación.[164] Ello, pues, "[q]uien alega la nueva filiación está obligado a impugnar la filiación existente a través de una acción de impugnación, o a ejercitar simultáneamente la de reclamación e impugnación..., pues sólo cuando la filiación oficial se destruye puede procederse a la determinación de la nueva".[165]

Sin embargo, este no es el caso cuando se interrelaciona una filiación adoptiva con una filiación natural. Como bien lo señala la autora española Estrella Toral Lara,

> El principio de incompatibilidad de filiaciones contradictorias no se aplica a la filiación adoptiva, porque ésta y la natural no son contradictorias. Que exista una filiación

---

[162] Castro Torres v. Negrón Soto, supra, pág. 592.

[163] E. Toral Lara, *Novedades en materia de determinación y prueba de filiación*, en Nuevos Conflictos del Derecho de Familia, Madrid, Ed. Wolter Kluwer España (ed. Eugenio Llamad Pombo), 2009, pág. 323.

[164] Sánchez Encarnación v. Sanchez Brunet, supra, pág. 672.

[165] E. Toral Lara, *op. cit.*, pág. 323.

natural determinada no impide que posteriormente se determina una filiación adoptiva y viceversa, que exista una filiación adoptiva no impide la posterior determinación de la filiación natural del adoptado sin destruir la primera. La razón es obvia, la filiación adoptiva no tiene su fundamento en la relación biológica de generación, sino en el acto jurídico de la adopción, y no impide que exista una filiación natural previamente determinada. Además debe tenerse en cuenta que, como regla general, la adopción supone la ruptura de los vínculos con la familia anterior, de manera que nunca pueden resultar contradictorias.[166]

La reforma legislativa en materia de adopción, decretada mediante el Art. 1 de la Ley Núm. 8 de 1995, *supra*, introdujo en nuestro ordenamiento jurídico una aceptación tácita del principio de la compatibilidad de la filiación adoptiva y la natural. Así, el Art. 137 de nuestro Código Civil provee que "[l]a determinación de filiación del adoptado que ocurra en fecha posterior al decreto de adopción, no afectará la adopción ya vigente, ni al adoptado y su familia adoptante".[167]

Los tratadistas españoles, interpretando el Art. 180.4 del Código Civil Español —equivalente a nuestro Art. 137— han afirmado que, aunque la adopción produce la extinción de los vínculos jurídicos existentes entre el adoptado y su familia biológica, "[e]sta ruptura, empero, es compatible con la sucesiva determinabilidad de la paternidad o maternidad biológica —antes desconocidos— del adoptado; determinación que, sin embargo, no otorgará

---

[166] Íd.

[167] 31 L.P.R.A. sec. 538 (2010).

vínculos jurídicos [con su familia de sangre]"[168] ni extinguirá la adopción previamente constituida.[169] Aunque la posterior determinación de la filiación natural sólo persigue impedir que el adoptado contraiga matrimonio con un pariente de su anterior familia biológica, la misma estará justificada.[170]

En síntesis, la subsiguiente determinación de la paternidad o maternidad biológica de un individuo no altera el carácter irrevocable de la adopción. Aunque un hijo, durante la vida de su presunto padre biológico, o un año luego de su muerte, pueda instar una acción de reconocimiento forzoso de filiación biológica en contra de éste, el éxito que pueda devengar de tal encomienda jurídica no eliminará los vínculos jurídicos que el adoptado tiene con su nueva familia adoptiva, ni revivirá los lazos que antes tenía con referencia a su familia de sangre. Para todos los efectos prácticos, esa nueva determinación de filiación biológica se limitará a exigir la subsistencia de los vínculos jurídicos del adoptado con su familia natural, a los únicos fines detallados en el Art. 138 del Código Civil de Puerto Rico,[171] a saber: el impedimento matrimonial.

---

[168] J.L. Lacruz Berdejo y otros, *op. cit.*, pág. 393. Véanse, también, J. Castán Tobeñás, *op. cit.*, pág. 440; L. Díez-Picazo y A. Gullón, *op. cit.*, pág. 312.

[169] Íd., pág. 394.

[170] Íd., pág. 393.

[171] El Art. 138 del Código Civil de Puerto Rico, 31 L.P.R.A. sec. 539, provee lo siguiente:

Habiendo considerado el marco jurídico aplicable a las controversias inicialmente esbozadas, pasemos a su disposición.

**III**

Como bien reiteramos en Rivera Pérez v. León, "en materia de filiación el Derecho puertorriqueño ha ido abriendo camino a través de la enmarañada jungla de prejuicios, convencionalismos sociales y tecnicismos de ley para hacer que brille la verdad y se reconozca a todos los fines legales la relación biológica entre padres e hijos".[172] Ante la inacción de la Asamblea Legislativa en la materia legal señalada, y fundamentando nuestros

No obstante lo dispuesto en la sec. 538 de este título, los vínculos jurídicos del adoptado con su familia paterna o materna anterior subsistirán cuando el adoptado sea hijo del cónyuge del adoptante, aunque el padre o madre hubiere fallecido a la fecha de presentación de la petición de adopción, o cuando el adoptado proviene de una única filiación y es adoptado por persona de distinto sexo al del padre o madre que lo ha reconocido como su hijo.

La ruptura y extinción de los vínculos jurídicos con la familia anterior del adoptado, y el nacimiento de tales vínculos con la familia del adoptante, se entenderán sin perjuicio de la reglamentación sobre impedimentos y prohibiciones de ley para contraer matrimonio en Puerto Rico. Un adoptado no podrá contraer matrimonio con un pariente de su anterior familia, en los mismos casos en que no hubiere podido contraerlo de no haber ocurrido la adopción.

La responsabilidad penal del adoptado en los delitos contra la familia y el estado civil seguirá siendo la misma que dispone el ordenamiento jurídico vigente, en relación a su familia biológica anterior, tal y como si no se hubiere decretado la adopción, si se probare que el adoptado conocía de su vínculo familiar con la víctima del incesto.

El adoptado adquirirá los apellidos del adoptante o los cónyuges adoptantes, salvo que el tribunal, por causa justificada, determine otra cosa.

[172] Rivera Pérez v. León, 138 D.P.R. 839, 849 (1995), citando a, Ramos v. Marrero, supra, pág. 358; Calo Morales v. Cartagena Calo, supra, pág. 119.

dictámenes jurisprudenciales sobre la premisa antes citada, hemos sido consistentes en flexibilizar la normativa puertorriqueña relativa al ámbito de la filiación a la luz de los recientes adelantos científicos y de las corrientes constitucionales modernas.[173]

Este proceder jurisprudencial ha encontrado su justificación en la importancia trascendental que reviste el estado filiatorio de un ser humano, de cuya certeza emanan aspectos importantes de naturaleza moral, patrimonial e, incluso, un interés público superior que atañe también al Estado.[174] "En definitiva, 'la filiación

---

[173] Rivera Pérez v. León, supra, pág. 849. En esa encomienda, hemos sido prontos en reconocer las alteraciones profundas que ha sufrido el Derecho de Filiación a nivel mundial, incluyendo "la gran apertura en orden al establecimiento de la filiación, sobre todo en vía judicial, y en cuanto a su impugnación, con su amplia admisibilidad y uso práctico de las pruebas biológicas". (Énfasis suprimido). Mayol v. Torres, supra, pág. 534. Así, nuestro "pensamiento jurídico es cónsono con 'el énfasis moderno en el descubrimiento de la verdad biológica'". (Citaciones internas omitidas.) Íd., pág. 535.

[174] Castro Torres v. Negrón Soto, supra, págs. 581-582. En Mayol v. Torres, supra, págs. 530-531, fuimos extensos en identificar los efectos y las consecuencias jurídicas implicadas por una determinación de filiación. Allí expusimos lo siguiente:
> "En cuanto a los efectos de la determinación de filiación, siempre hemos destacado lo amplio y complejos que son los derechos y las obligaciones que ésta conlleva. Así, hemos expresado que 'de la filiación dependen varios estados civiles, que como tales, concretan la capacidad e independencia de la persona'. Almodóvar v. Méndez Román, 125 D.P.R. 218, 232 (1990). En ese caso explicamos que "... de ser hijo de tal o cual persona deriva que se tenga una u otra nacionalidad, o una u otra vecindad ... cualidades éstas que deciden el régimen de los demás estados de la persona, ya que la capacidad y las relaciones familiares se rige[n] por la ley personal ... aparte de la trascendencia que la determinación de la ley personal tiene en el régimen de otras materias (sucesiones, donaciones, obligaciones ...). De la filiación depende directamente además la determinación de las personas que están legitimadas para provocar un cambio de estado civil (emancipación, adopción), o para promover judicialmente el cambio (por incapacitación). La filiación determina, también, las personas a quienes se está sujeto durante la minoría de edad (o en situación de patria potestad prorrogada). Influye la filiación en el poder de la persona: por la filiación se conoce si una

es la nota de mayor jerarquía dentro del parentesco y portadora de las más importantes consecuencias jurídicas'".[175]          Teniendo presente el carácter trascendental de la institución de la filiación –adoptiva o natural-, consideremos cada uno de los errores imputados al Tribunal de Apelaciones por parte de los peticionarios a la luz de los párrafos que anteceden.

**A. *La causa de acción de los recurridos no está sujeta a la doctrina de la cosa juzgada o del impedimento colateral por sentencia.***

Los peticionarios en el caso de autos le imputan al Tribunal de Apelaciones haber errado por no haber resuelto que la segunda demanda de los peticionarios era cosa

---

persona tiene herederos forzosos, con la consiguiente trascendencia en relación con la potestad de donar ... o de disponer 'mortis causa' ... o, en general, con la potestad de gestión del propio patrimonio (por la posible declaración de prodigalidad ...)." (Énfasis en el original.) Almodóvar v. Méndez Román, supra, pág. 233, citando a M. Peña Bernaldo De Quirós, De la Paternidad y Filiación, en M. Amorós Guardiola, Comentarios a las reformas del derecho de familia, Madrid, Ed. Tecnos, 1984, Vol. I, pág. 795.

Queda claro que la filiación incide con mayor intensidad en el derecho de familia (en aquello relacionado con el estado civil, la persona, el derecho de alimentos, patria potestad, entre otros aspectos) y el derecho sucesorio. Sin embargo, no debemos soslayar las notables consecuencias vinculadas al derecho penal derivadas de la determinación de filiación. Entre otras, nuestro Código Penal dispone en su Art. ... [142(h) (33 L.P.R.A sec. 4770)], que ... [incurrirá en delito grave de segundo grado severo toda persona que lleve a cabo una penetración sexual, sea vaginal, anal, orogenital, digital o instrumental... con sus] ascendientes y descendientes, y colaterales por consanguinidad, [o con una víctima con quién tenga una relación de parentesco por motivo de una adopción].... La filiación no se limita, pues, a establecer vínculos tendentes a identificar relaciones entre componentes de la sociedad, sino que va dirigida a imponer derechos y obligaciones concretas de consecuencias permanentes.

[175] (Citaciones internas omitidas.) Íd.

juzgada y/o estaba sujeta a la doctrina del impedimento colateral por sentencia. No le asiste la razón.

Como bien expusimos anteriormente, la doctrina de cosa juzgada surte efecto únicamente cuando entre el primer caso resuelto por sentencia y el segundo caso en el cual se invoca la doctrina bajo examen, existe la más perfecta identidad entre las cosas, las causas, las personas de los litigantes y la calidad con que lo fueron.

Al analizar la segunda demanda de los recurridos, ésta propulsa dos causas de acción fundamentales, a saber: (1) una acción de nulidad del decreto de adopción de 1973 fundamentada en el supuesto vicio del consentimiento prestado por la madre biológica del señor Beníquez Méndez; y (2) una acción de reconocimiento forzoso de filiación extramatrimonial instada por el señor Beníquez Méndez en contra del señor Vargas Seín.

Cuando examinamos la primera causa de acción de los recurridos, encontramos que entre ésta y la segunda demanda presentada por el señor Beníquez Méndez y su madre biológica, coincide la más perfecta identidad de las causas, las personas de los litigantes y la calidad con que lo fueron, referente al petitorio instado por los recurridos solicitando la nulidad del decreto de adopción de 1973. Concretamente, encontramos que: (1) el asunto levantado en ambos litigios concierne la nulidad de un decreto de adopción decretado hace 30 años –identidad de cosas–; (2) el motivo o la razón de pedir que fundamenta

ambas peticiones lo es el alegado vicio en el consentimiento prestado por la madre biológica del señor Beníquez Méndez, por razón de haber sido supuestamente sometida a un patrón de coacción e intimidación por sus tíos -identidad de las causas-; y (3) los demandados y los demandantes en ambas acciones lo son el matrimonio Beníquez Mendez, y el señor Beníquez Méndez y su madre biológica, respectivamente, cumpliéndose así la concurrencia de la identidad de los litigantes y la calidad en que lo fueron.

En virtud de lo anterior, y en circunstancias normales, tal conclusión implicaría que la primera sentencia decretada por el Tribunal de Primera Instancia el 13 de septiembre de 2003 impediría que los recurridos hubiesen podido presentar o litigar una segunda causa de acción de nulidad del decreto de adopción por los mismos fundamentos y contra las mismas partes que fueron incluidas en la primera demanda, especialmente cuando los recurridos no acudieron en alzada de la primera decisión del foro primario. No obstante, aun cuando están presentes todos los componentes necesarios para que la doctrina de cosa juzgada surta efectos, desde hace medio siglo este Tribunal adoptó la norma de no aplicar esa figura a casos en los que se frustren los fines de la

justicia o cuando se plantean consideraciones de alto interés público.[176]

Precisamente en Pérez v. Bauzá, *supra*, nos apartamos de la "rigidez que impone la cosa juzgada" y tomamos en consideración que la sentencia que se oponía como cosa juzgada "no adjudicó los méritos de la causa de acción ejercitada", y que se consideró "una adjudicación final únicamente por disposición estatutaria fundada en la conveniencia pública de la finalidad de las sentencias".[177] Además, se trataba "de una acción de filiación revestida de interés público".[178] Recordemos que en este caso la primera Resolución del Tribunal de Primera Instancia de 13 de septiembre de 2003 declaró no ha lugar la moción sin fundamento alguno. Por eso, este caso no es cosa juzgada.

Además, la preocupación del Juez Presidente señor Hernández Denton de que con este dictamen se "amenaza la estabilidad de la filiación jurídica entre adoptados y padres adoptivos" se disipa ante la existencia, precisamente, del término de caducidad que la ley dispuso para la impugnación de una adopción. En otras palabras, quien desee impugnar la adopción tendrá el término de caducidad que dispone la ley. Nada más. Así, pues, esta conclusión "no le resta finalidad a los decretos de

---

[176] Banco de la Vivienda de P.R. v. Carlo Ortíz, 130 D.P.R. 730, 739 (1992); Pérez v. Bauzá, supra, pág. 226.

[177] Íd., págs. 226-227.

[178] Íd. Véase, además, Mercado Riera v. Mercado Riera, supra, pág. 953.

adopción" ni atenta contra "la política pública a favor de la estabilidad de las relaciones jurídicas mediante decreto de adopción". Dicho de otro modo, la excepción a la doctrina de cosa juzgada que hoy reafirmamos en nada trastoca ni lacera el término de caducidad que establece el Art. 613E del Código de Enjuiciamiento Civil, *supra*.

Como bien indicamos al inicio de esta parte dispositiva, la institución de la filiación, incluyendo su vertiente adoptiva, constituye un interés superior que incide trascendentalmente en la personalidad y dignidad del ser humano y carga consigo importantísimas consecuencias legales y morales. A su vez, nuestra jurisprudencia ha reconocido que la filiación es un interés público superior que atañe también al Estado. Por tal motivo, y en aras de propiciar justicia en el caso concreto ante nos, no aplicaremos la doctrina de la cosa juzgada a la segunda demanda de impugnación de adopción instada por los recurridos.

Referente a la segunda causa de acción del señor Beníquez Méndez y su madre biológica, la acción de reconocimiento forzoso levantada en contra del señor Vargas Seín, el Tribunal de Primera Instancia determinó que la misma estaba impedida por causa de la doctrina del impedimento colateral por sentencia. El Tribunal de Apelaciones revocó al foro primario. No incidió en error.

Según nuestra exposición del Derecho, la figura del impedimento colateral por sentencia representa una

modalidad de la doctrina de la cosa juzgada, la cual se distingue de ésta última en que para aplicarla no es necesario que se dé el requisito de la identidad de causas entre ambos litigios. Claro está, la misma no procede cuando (1) la parte contra la cual se interpone no ha tenido la oportunidad de litigar previamente el asunto –o cuando pudiendo haber litigado el asunto en la primera acción, el asunto no fue litigado o adjudicado en el pleito anterior-, y (2) cuando ese litigante no ha resultado ser la parte perdidosa en el pleito anterior.

En el caso de marras, la segunda demanda incluyó, por primera vez, una reclamación de filiación extramatrimonial presentada en contra del señor Vargas Seín, en la cual el señor Beníquez Méndez argüía que aquél era su padre biológico. Esta segunda causa de acción impide que exista una identidad de causas entre ambos litigios y activa la posibilidad de que aplique la doctrina del impedimento colateral por sentencia. Sin embargo, no procede la interposición de dicha figura ya que, aunque los recurridos pudieron haber interpuesto el asunto en el pleito anterior, el dictamen caído en la primera sentencia del foro primario no adjudicó el asunto, y los litigantes, en efecto, no litigaron la acción de reconocimiento de filiación ni resultaron ser la parte perdidosa con referencia a la misma.

Por tal motivo, resolvemos que en el caso de autos no son de aplicación la doctrina de cosa juzgada ni su modalidad, el impedimento colateral por sentencia.

**B. *La caducidad de la acción de nulidad de la adopción y el vicio en el consentimiento de la madre biológica por motivo de coacción o intimidación.***

En el primer error que los peticionarios le imputan al Tribunal de Apelaciones, éstos alegan que el foro apelativo intermedio erró al determinar que la causa de acción presentada por la parte recurrida no había caducado.  Le asiste la razón.

Al momento de la adopción del señor Beníquez Méndez, el derogado Art. 613E del antiguo Código de Enjuiciamiento Civil, *supra*, proveía que, transcurrido un término de dos años desde el decreto de adopción, **cualquier irregularidad** en los procedimientos quedaba subsanada y la adopción no podía ser atacada, directa o colateralmente, en ningún procedimiento.

Consideramos, al igual que opina el profesor González Tejera, que el lenguaje de ese estatuto, aunque no es claro, fija un término igual para atacar la adopción por vicios del consentimiento. Como expresáramos, el derogado Art. 135 del Código Civil de Puerto Rico exigía, antes de la reforma en materia de adopción de 1995, que los padres de un menor de edad prestasen su consentimiento a la adopción de su hijo o hija biológica. Si el hijo era de

filiación extramatrimonial, sólo el padre que lo había reconocido era aquel llamado a proveer su consentimiento.

Por consiguiente, cuando el consentimiento del padre o la madre biológica fue prestado, pero estuvo viciado por el error, el dolo, la violencia, o la intimidación, la acción de impugnación deberá ser instada dentro del término de caducidad de dos años desde que se decretó la adopción.

En este caso, la madre del menor sí prestó su consentimiento, aunque treinta años después alegue que estuvo viciado. Cónsono con lo anterior, la madre gozaba de un término de dos años de caducidad, desde que se decretó la adopción el 21 de febrero de 1973 para impugnar la adopción. Para los hechos de este caso, no nos corresponde analizar si la norma que resolvimos en Almodóvar v. Méndez Román,[179] aplica también a los casos de impugnación de las adopciones. Al examinar el expediente encontramos que el señor Beníquez Mendez tenía seis años de edad cuando su madre y él se mudaron de la casa de sus tíos. Al tomar esa acción, la madre de Beníquez Méndez se alejó del ambiente familiar y comunitario que viciaba su consentimiento. Aún si aplicáramos la norma de ese caso, ya han pasado más de treinta años desde el cese de esa supuesta intimidación o violencia, por lo que a todas

---

[179] 125 D.P.R. 218, 261 (1990). En ese caso resolvimos que en casos de haber mediado intimidación o violencia, el plazo para iniciar una acción de impugnación de reconocimiento al amparo del Art. 117 del Código Civil, 31 L.P.R.A. sec. 465, comenzaría a transcurrir una vez cesaran esas circunstancias. Cabe señalar que el Art. 117 del Código Civil, supra, fue enmendado por la Ley Núm. 215-2009.

luces, la acción para invalidar la adopción ha caducado. Por ese motivo procede su desestimación.

## C. El señor Beníquez Méndez y su derecho a conocer su filiación biológica paternal.

Finalmente, resta disponer si, a pesar de haberse resuelto que la acción de impugnación de la adopción del señor Beníquez Méndez había caducado, procede que el Tribunal de Primera Instancia continúe con la acción de reconocimiento forzoso de filiación presentada en contra del señor Vargas Seín. Veamos.

Según expusimos en nuestro marco legal, la institución de la filiación se desdobla en dos vertientes fundamentales: la natural y la jurídica. En el caso de autos, el recurrido conocía su filiación natural maternal -la señora Beníquez Seguí- pero desconocía su filiación natural paternal. Algunos años luego de su nacimiento, el señor Beníquez Méndez fue adoptado por sus tíos segundos maternos. Mediante la referida adopción, todos los vínculos jurídicos existentes entre el recurrido y su madre o padre biológico cesaron de existir, y para todos los efectos legales, el señor Beníquez Méndez vino a ser hijo de sus tíos maternos por virtud de la filiación jurídica de la adopción.

Tres décadas después, el recurrido procura conocer a su padre biológico mediante la presentación de una acción de reconocimiento forzoso de filiación paterna extramatrimonial. Debido a que el Art. 137 de nuestro

Código Civil dispone que la filiación natural subsiguiente no es contradictoria a una filiación adoptiva preexistente, no encontramos impedimento doctrinal alguno que sirva de tropiezo para que el foro primario considere adecuadamente la acción de determinación de filiación extramatrimonial instada por el recurrido. Esa solicitud fue instada oportunamente.

Siempre y cuando la acción haya sido presentada durante la vida del presunto padre, o un año después de su muerte -salvo ciertas excepciones antes discutidas- el peticionario podrá presentar toda aquella prueba pertinente que constate el hecho filiatorio alegado. Claro está, de prosperar en su acción de reconocimiento forzoso, la resolución emitida por el tribunal no eliminará los vínculos jurídicos existentes entre sí y su familia adoptiva y tampoco revivirá su relación jurídica con su familia de sangre. Esta última relación sólo subsistirá a los únicos fines de impedir que el recurrido se case con algún pariente de su familia natural, según prohibido por nuestro ordenamiento legal, o que incurra en ciertos delitos que tipifican las relaciones consensuales entre parientes de determinados grados de consanguinidad o afinidad.

Atendido lo anterior, encontramos innecesario expresarnos sobre el último error planteado por los peticionarios, especialmente cuando concebimos que los hechos alegados en la demanda de los recurridos no

configuran fraude al tribunal, el cual justifique un término mayor al de seis meses provisto para la presentación de una moción de relevo de sentencia.

**IV**

Por los fundamentos expuestos, confirmamos en parte el dictamen del Tribunal de Apelaciones y devolvemos el caso al Tribunal de Primera Instancia para que éste continúe con los procedimientos relacionados a la acción de reconocimiento forzoso instada por el señor Beníquez Méndez en contra del señor Vargas Seín. No obstante, desestimamos la acción de impugnación de adopción de los recurridos por entender que ésta ha caducado.

Se dictará sentencia de conformidad.


Edgardo Rivera García
Juez Asociado

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Samuel Beníquez Méndez;
Antonia Beníquez Seguí

                                          *Certiorari*

        Recurridos

            v.                        CC-2007-1131

    Teófilo Vargas Seín;
  Ada E. Méndez Costas y
 Félix Beníquez Quiñones

        Peticionarios


                        SENTENCIA


En San Juan, Puerto Rico, a 4 de enero de 2012.

        Por los fundamentos expuestos en la Opinión que antecede, confirmamos en parte el dictamen del Tribunal de Apelaciones y devolvemos el caso al Tribunal de Primera Instancia para que éste continúe con los procedimientos relacionados a la acción de reconocimiento forzoso instada por el señor Beníquez Méndez en contra del señor Vargas Seín.

        No obstante, desestimamos la acción de impugnación de adopción de los recurridos por entender que ésta ha caducado.

        Lo acordó el Tribunal y lo certifica la Secretaria del Tribunal Supremo. El Juez Presidente señor Hernández Denton disintió con una opinión escrita. La Jueza Asociada señora Fiol Matta está conforme con la determinación de que en el presente caso no debe aplicarse la doctrina de cosa juzgada ni su modalidad de impedimento colateral por sentencia y concurre con la decisión de devolver el caso al Tribunal de Primera Instancia para que continúe el trámite de la acción de reconocimiento forzoso presentada en contra del señor Vargas Seín. No obstante, disiente de la conclusión de que la acción de impugnación de la

adopción caducó, puesto que es palpable la posibilidad de que el proceso de adopción hubiera sido simulado desde su inicio, por lo cual procede que el Tribunal de Primera Instancia reciba y aquilate prueba sobre la validez de dicho proceso. La Juez Asociada señora Rodríguez Rodríguez concurrió y disintió con una opinión escrita.

Larissa Ortiz Modestti
Secretaria del Tribunal Supremo, Interina

EN EL TRIBUNAL SUPREMO DE PUERTO RICO


Samuel Beníquez Méndez;
Antonia Beníquez Seguí

  Recurridos

    v.            CC-2007-1131

Teófilo Vargas Seín,
Ada E. Méndez Costas y
Félix Beníquez Quiñones

  Peticionarios


Opinión Disidente emitida por el Juez Presidente señor HERNÁNDEZ DENTON


    San Juan, Puerto Rico, a 4 de enero de 2012.

    Por entender que este caso debió ser desestimado, sin más, por tratarse de cosa juzgada, disiento de la Opinión emitida por una mayoría de este Tribunal. Con su decisión, a pesar de establecer que la acción de anulabilidad de adopción caducó y que por ello los lazos adoptivos no pueden ser impugnados, este Foro devuelve el caso al Tribunal de Primera Instancia para que se resuelva si el adoptado es hijo del supuesto padre biológico. Ese dictamen contradictorio y dilatador tiene el propósito de que el adoptado evite incurrir en incesto o casarse con sus parientes dentro de los grados de consanguineidad prohibidos por nuestro ordenamiento. En nuestra opinión, este proceder es especulativo y posiblemente

presenta una controversia no justiciable por tratarse de un asunto que no está maduro.

                                    I.

El Sr. Samuel Beníquez Méndez (adoptado) y su madre biológica, la Sra. Antonia Beníquez Seguí (madre biológica), acudieron al foro judicial para impugnar la adopción por parte del matrimonio Beníquez Méndez (adoptantes). El adoptado nació en 1971, y, al anotarse su nacimiento en el Registro Demográfico, no se divulgó el nombre de su padre biológico. Al año siguiente, el matrimonio Beníquez Méndez peticionó su adopción. En su escrito ante el foro primario, los adoptantes alegaron tener bajo su custodia al adoptado y que eran los tíos de la madre biológica, quien vivía con ellos por no tener recursos para su sustento. Esta última consintió a la adopción, la cual se concedió en 1973.

Casi treinta (30) años después, en 2003, el adoptado y la madre biológica presentaron ante el Tribunal de Primera Instancia una petición de nulidad de la adopción. Esencialmente, argumentaron que el consentimiento de la madre biológica a la adopción estuvo viciado, pues esta fue coaccionada e intimidada por los adoptantes. Por lo tanto, alegaron que el tribunal nunca tuvo jurisdicción para conceder la adopción. Asimismo, alegaron que el menor siempre fue criado por su madre biológica y que ambos se mudaron de la casa de los adoptantes cuando el adoptado tenía seis (6) años. Mediante resolución no fundamentada, el foro primario declaró no ha lugar la petición. Esa decisión nunca fue apelada o revisada, por lo que advino final y firme.

Luego, en 2004, la madre biológica y el adoptado instaron una segunda demanda sobre nulidad de adopción y declaración de filiación. Esta vez, alegaron que la madre biológica fue coaccionada, amenazada y sujeta a presiones morales, emocionales y religiosas por parte de sus familiares y compañeros feligreses para que consintiera a la adopción. Esto, pues el alegado padre biológico del adoptado es el señor Teófilo Vargas Seín T/C/C Aarón, líder espiritual de la Congregación Mita. Por ello, solicitaron que se decretara la nulidad de la adopción y que se ordenara al Registro Demográfico inscribir al adoptado como hijo de sus padres biológicos.

El foro primario desestimó sumariamente los reclamos, por entender que el dictamen judicial que denegó la primera demanda era cosa juzgada. En cuanto a la nueva alegación sobre quién era el padre biológico, concluyó que aplicaba la doctrina de impedimento colateral por sentencia. Inconformes, los demandantes acudieron ante el Tribunal de Apelaciones, el cual revocó al foro primario. El foro apelativo intermedio concluyó que no aplicaba la doctrina de cosa juzgada al caso de autos y que la acción de nulidad de adopción no había caducado.

Insatisfechos, los adoptantes y el supuesto padre biológico acuden ante nos. Plantean que la acción presentada por los demandantes caducó, que la controversia presentada en la demanda es cosa juzgada o existe impedimento colateral por sentencia y que transcurrió en exceso el término para interponer una moción de relevo de sentencia al amparo de la

Regla 49.2 de Procedimiento Civil, 32 L.P.R.A. Ap. V R.49.2, para levantar la desestimación dictada en el año 2003.

II.

La Opinión del Tribunal resuelve que la doctrina de cosa juzgada no aplica a la acción para impugnar un procedimiento de adopción. Esto, a pesar de que concluye que se cumplen todos los requisitos para su aplicación en el caso de autos. Para ello, señala que la institución de la filiación constituye un interés público superior. Por entender que ese dictamen amenaza la estabilidad de la filiación jurídica entre adoptados y padres adoptivos, resolveríamos lo contrario. Somos del criterio que el interés legislativo ha sido claro al buscar la **finalidad** del proceso de adopción.

Concluir que no aplica la doctrina de cosa juzgada a casos como el de autos permitiría a un adoptado impugnar su adopción en repetidas ocasiones. Solo se le requeriría instar dicha acción dentro del término de caducidad dispuesto para ello, sin importar que exista un dictamen adverso que haya advenido final y firme. Siendo así, ignorar la doctrina de cosa juzgada en estos casos les resta finalidad a los decretos de adopción y le brinda al adoptado más oportunidades para atacar su adopción. Este proceder no es cónsono con la política pública a favor de la estabilidad de las relaciones jurídicas establecidas mediante decreto de adopción. Incluso, tal y como menciona la Opinión del Tribunal, es norma establecida que "los adoptantes y adoptados no gozan de la facultad de poder dejar sin efecto, unilateral o bilateralmente, la adopción consumada por haber

experimentado un cambio de criterio con referencia a su deseabilidad de haber consentido a la adopción". Opinión mayoritaria citando a R. Serrano Geyls, Derecho de Familia de Puerto Rico y Legislación Comparada, Ed. Universidad Interamericana de Puerto Rico, Vol. II, 2002, pág. 1187.

Asimismo, la Opinión del Tribunal recalca la naturaleza irrevocable de un decreto de adopción. Esta irrevocabilidad y el interés legislativo de darle finalidad a los procesos de adopción se refleja claramente en los términos de caducidad dispuestos para instar la acción de anulabilidad de adopción. Para el momento de la adopción en cuestión, el referido término era de dos (2) años. Art. 613E del Código de Enjuiciamiento Civil, supra. Posteriormente, la Ley Núm. 9 de 19 de enero de 1995, 32 L.P.R.A. ant. sec. 2699r (ed. 2004), redujo dicho término a un (1) año. Finalmente, la Ley de Reforma Integral de Procedimientos de Adopción de 2009 lo redujo a seis (6) meses a partir de la fecha en que el decreto de adopción advenga final y firme. 32 L.P.R.A. sec. 2699r. Esta reducción del término de caducidad disponible para anular un decreto de adopción demuestra consistentemente su naturaleza irrevocable y, por ende, su finalidad.

De otra parte, debe recalcarse que el legislador impuso un término de caducidad y no uno de prescripción. La caducidad conlleva la pérdida automática del derecho por no ejercitarse en el transcurso de cierto plazo. Véase: Castro Torres v. Negrón Soto, 159 D.P.R. 568, 596 (2003). Siendo así, el legislador quiso para esta acción el término con consecuencias concluyentes, con el ánimo de proteger la

estabilidad de la filiación jurídica adoptiva. De la misma forma, limitó la acción para impugnar la filiación. Véanse: Mayol v. Torres, 164 D.P.R. 517, 553 (2005); Castro Torres v. Negrón, *supra*; Sánchez v. Sánchez, 154 D.P.R. 645, 669 (2001); Almodóvar v. Méndez, 125 D.P.R. 218, 260 (1990). Por todo lo anterior, entendemos que ignorar la aplicación de la doctrina de cosa juzgada en casos como el de autos menoscaba la irrevocabilidad de la filiación jurídica que el ordenamiento protege mediante la imposición de un breve término de caducidad para su impugnación.

Por último, no estamos de acuerdo con devolver el caso al foro primario para determinar la filiación biológica del adoptado. En primer lugar, ordenar al supuesto padre biológico que se someta involuntariamente a pruebas genéticas para determinar si es el padre del adoptado constituye una violación a su derecho constitucional a la intimidad. Véase: Art. II Secs. 8 y 10 Const. E.L.A., L.P.R.A., Tomo 1. Anteriormente, hemos permitido la transgresión de este derecho constitucional en circunstancias en las que el solicitante tiene intereses pecuniarios que dependen de dicha determinación, como lo serían la petición de alimentos o la reclamación de derechos hereditarios. Véanse: Mayol v. Torres, *supra*; Vicenti v. Saldaña, 157 D.P.R. 37 (2002). Estas circunstancias no están presentes en el caso de autos, por lo que no existe un interés apremiante de reconocer la relación biológica entre padres e hijos. Mayol v. Torres, *supra.*

En segundo lugar, las justificaciones en las que descansa la Opinión mayoritaria para ordenar la determinación de paternidad son prematuras y especulativas. El adoptado no ha solicitado que se determine su filiación biológica para evitar incurrir en alguna de las conductas prohibidas por el Art. 138 del Código Civil de Puerto Rico, 31 L.P.R.A. sec. 539. Tampoco ha manifestado interés alguno en casarse con alguna pariente del supuesto padre biológico. Mucho menos, ha manifestado interés en relacionarse incestuosamente con un pariente del supuesto padre biológico, según el Art. 138 del Código Civil. Íd. Siendo así, la Opinión mayoritaria está brindando un remedio que no se solicitó, para disponer de una controversia que no se presentó ante nos y que, con toda probabilidad, no estaría madura para atenderse.

Más aun, las fuentes que se utilizan para justificar este remedio no tratan sobre una determinación de filiación biológica luego de emitido un decreto de adopción. Véanse: Mayol v. Torres, *supra*; Castro Torres v. Negrón Soto, 159 D.P.R. 568 (2003); Rivera Pérez v. León, 130 D.P.R. 839 (1995); Calo Morales v. Cartagena Calo, 129 D.P.R. 102 (1991); Almodóvar v. Méndez Román, 125 D.P.R. 218 (1990); Ramos v. Marrero, 116 D.P.R. 357 (1985).

Contrario a su aseveración, en el más reciente pronunciamiento del legislador sobre nuestro derecho de adopción, la Ley de Reforma Integral de Procedimientos de Adopción de 2009, *supra,* se declaró como política pública "que el procedimiento de adopción sea […] confidencial, para

proteger el derecho constitucional a la intimidad de las partes". 32 L.P.R.A. sec. 2699.

Por lo tanto, nos parece errado ordenar unas pruebas genéticas para lograr una determinación de filiación biológica que no tendrá consecuencias patrimoniales para las partes, debido a que ya existe un decreto de adopción que no puede ser anulado. Ello amenaza la estabilidad de las filiaciones jurídicas y establece un precedente en contra de la confidencialidad de los procesos de adopción.


                              Federico Hernández Denton
                              Juez Presidente

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

|  |  |
|---|---|
| Samuel Beníquez Méndez; Antonia Beníquez Seguí<br><br>Recurridos<br><br>v.<br><br>Teófilo Vargas Seín, Ada E. Méndez Costas y Félix Beníquez Quiñones<br><br>Peticionarios | CC-2007-1131 |

Opinión Concurrente y Disidente emitida por la Juez Asociada señora Rodríguez Rodríguez

San Juan, Puerto Rico, a 4 de enero de 2012

Estoy de acuerdo con lo resuelto por una mayoría de este Tribunal en cuanto a que en el caso de autos no son aplicables la doctrina de cosa juzgada ni su modalidad, el impedimento colateral por sentencia. Sin embargo, por entender que la adopción pudo carecer de causa y por tanto ser nula *ab initio*, disiento de la mayoría en cuanto a que la causa de acción presentada por los recurridos ha caducado. Es por ello que devolvería el caso al foro primario para que celebrase una vista en los méritos sobre la nulidad de la adopción. De igual manera, soy del criterio que, de ser la adopción ante nuestra consideración una nula por falta de causa, el adoptado estaría facultado para perseguir su filiación biológica durante toda la vida de su alegado padre natural, según dispuesto por el Código Civil. 31 L.P.R.A. sec. 505 (1993).

I

Samuel Beníquez (adoptado) nació el 28 de octubre de 1971. Su madre biológica, doña Antonia Beníquez (madre

biológica) lo inscribió en el Registro Demográfico como hijo suyo y de padre de nombre desconocido. El 5 de junio de 1972 don Félix A. Beníquez Quiñones y doña Ada Méndez Costas (adoptantes), tíos de la madre biológica, presentaron una petición de adopción.

En la petición de adopción los adoptantes sostuvieron que habían tenido bajo su custodia al adoptado y a la madre biológica (recurridos) desde el día en que el menor nació y que podían hacerse cargo de proveerle todo lo necesario para su desarrollo físico y espiritual. Asimismo, mediante declaración jurada, la madre biológica dijo que tanto ella como el adoptado vivían al amparo de los adoptantes y que para el bienestar, felicidad y seguridad del menor, deseaba que éste estuviese vinculado permanentemente con aquéllos en calidad de hijo. Además, durante la vista para conceder la adopción, los adoptantes se comprometieron a hacer hijo suyo al adoptado y tratarlo de igual manera que a sus hijos biológicos. Así las cosas, el Tribunal concedió la adopción el 27 de febrero de 1973 y ordenó inscribir en el Registro Demográfico al adoptado como hijo de los adoptantes.

El 30 de abril de 2003, treinta años después de decretada la adopción, la madre biológica y el adoptado (recurridos) presentaron una "Solicitud de Nulidad de Adopción" en el Tribunal de Primera Instancia, Sala de Caguas. En dicha solicitud adujeron que la madre biológica fue intimidada y coaccionada para consentir la adopción con lo cual su consentimiento, al momento del procedimiento, estaba viciado haciendo nula la resolución de adopción.

Además, alegaron que, como cuestión de hecho, los adoptantes nunca le profesaron cariño, cuidados, ni afecto al adoptado. Tampoco cumplieron con su obligación de proveer alimentos, cuidarlo, educarlo, ni lo tuvieron bajo su custodia. Igualmente alegaron que ambos ocuparon un cuarto de servicio en la casa de los adoptantes hasta que, en 1978, se mudaron de la residencia de éstos. Sostuvieron, también, que los adoptantes nunca reclamaron la custodia del adoptado ni hicieron gestión alguna para mantenerlo en el hogar; tampoco lo trataron como si fuera hijo biológico, cosa que se obligaron a hacer en la vista de adopción.

La sala de Caguas del Tribunal de Primera Instancia emitió una notificación con fecha 18 de septiembre de 2003, donde certificó que se proveía no ha lugar a la solicitud de nulidad de adopción. Dicha orden no contó con determinaciones de hecho ni conclusiones de derecho por lo cual no conocemos sus fundamentos. Los recurridos no apelaron la orden del tribunal de instancia.

No obstante lo anterior, el 3 de noviembre de 2004 los recurridos presentaron una demanda en la que solicitaron la anulación de la adopción y declaración de filiación. En esta ocasión, además de demandarse a los adoptantes, se demandó por primera vez al señor Teófilo Vargas Seín, también conocido como Aarón, alegándose que éste era el padre biológico del adoptado. Luego de varios incidentes procesales el tribunal de instancia desestimó la acción presentada. Fundamentó su determinación en la orden emitida por el tribunal el 18 de septiembre de 2003 en cuanto a la

solicitud de nulidad de adopción. Señaló que ésta advino final y firme al no apelarse oportunamente, por lo cual el tribunal carecía de jurisdicción.

Inconformes, los recurridos presentaron recurso de apelación ante el Tribunal de Apelaciones. El tribunal *a quo* revocó la sentencia apelada, sostuvo que no se le había permitido al adoptado litigar la única causa de acción a la que tenía derecho: perseguir una acción de filiación contra quien, alegadamente, era su padre biológico. De esta manera, devolvió el caso al Tribunal de Primera Instancia para que continura con los procedimientos.

Insatisfechos, los adoptantes y Vargas Seín (peticionarios) comparecen ante este Tribunal afirmando que, entre otros señalamientos de error, erró el Tribunal de Apelaciones al determinar que la causa de acción presentada por el adoptado y su madre biológica no había caducado. No les asiste la razón. Veamos.

**II**

**A**

La adopción es la figura legal mediante la cual se busca instaurar entre dos personas una relación jurídica de filiación; es decir, vínculos jurídicos similares a los existentes entre una persona y sus descendientes biológicos. *Feliciano Suárez, Ex* parte, 117 D.P.R. 402, 406-408 (1986). De igual manera es "un acto jurídico solemne, el cual supone la ruptura total del vínculo jurídico-familiar de una persona con su parentela biológica y la consecuente filiación de ésta con aquél o aquéllos que han expresado la

voluntad de que legalmente sea su hijo". *López Rivera v. E.L.A.*, 165 D.P.R. 280 (2005), en la pág. 299. (Citas omitidas). Reiteradamente hemos señalado que el propósito primordial de esta institución es el bienestar del menor. *Id.* en la pág. 300. (Citas omitidas).

En cuanto a la Ley 85 de 15 de junio de 1953, no albergamos duda que, al igual que la normativa vigente sobre adopción, buscaba proteger a la persona adoptada. Incluso, se decidió en aquel entonces que un decreto de adopción disolvería el vínculo jurídico con la familia biológica dado que el mismo podría entorpecer la integración del adoptado al nuevo seno familiar. *Véase* Historial Legislativo de la Ley 85 de 15 de junio de 1953. Sobre esto hemos apuntalado que la decisión de un tribunal sobre si se autoriza o no una adopción descansa en la conveniencia y bienestar del niño. *Ex Parte J.A.A.*, 104 D.P.R. 551 (1976).

Cónsono con lo anterior, Eduardo Vázquez Bote señala que:

> [p]uede definirse la adopción como el negocio jurídico familiar por el cual se establece entre dos personas una relación perfecta de filiación legítima.
>
> Son características de la institución, las siguientes:
> a) Es un acto de carácter irrevocable. Ciertamente, la nueva redacción del Código [C]ivil vigente, nada concreta al respecto; pero tal carácter deriva indudablemente por referirse al estado civil de las personas.
> b) Es un acto formalmente determinado, sujeto en su contenido a una tipificación legal rigurosa.
> c) Es un acto que opera como eficacia peculiar el acceso a la patria potestad, o de modificar completamente la antes existente, con efectos absolutos, al romperse el vínculo del adoptado con la familia anterior (art. 133 C.c.).

Eduardo Vázquez Bote, *Derecho Privado Puertorriqueño*, Butterworth Legal Publishers, Butterworth de Puerto Rico, San Juan 1ra ed., t. 11,  1993, en la pág. 343. *Véanse además,* José Castán Tobeñas, *Derecho Civil español, común y foral*, Reus, Madrid, 10ma ed., t. 5-II, 1995, en la pág. 361; Manuel Albadalejo, *Curso de Derecho Civil*, Librería Bosch, Barcelona, 2da ed., vol. IV, 2002, pág. 255; Rosa María Moreno Florez, *Acto Constitutivo de la Adopción*, Editorial Colex, Madrid, 1985.

Es necesario indicar que son actos jurídicos "los actos humanos voluntarios exteriores y que producen efectos jurídicos". Federico Puig Peña, *Compendio de Derecho Civil Español*, Ediciones Pirámides S.A., Madrid 3ra ed. revisada y puesta al día, t. I, 1976, en la pág. 455 (Citas omitidas). Éstos están caracterizados por, en primer lugar, ser voluntarios; segundo, la voluntad tiene que ser consciente y exteriorizada; por último, deben tener efectos jurídicos. *Véase Id.*

Ahora bien, el negocio jurídico recoge siempre un acto jurídico. Es decir que el primero, además de ser un acto humano voluntario y exterior que produce efectos jurídicos, "los produce *porque* son queridos, ya que el agente tiende, al realizarlo, precisamente a producirlos". Manuel Albaladejo, *Derecho Civil*, José María Bosch Editor S.A., Barcelona 11ma ed., 1991, en la pág. 148.

En este sentido, un acto jurídico se diferencia de un negocio jurídico porque este último se caracteriza por ser "[a]quel acto consistente o no en una declaración o acuerdo

de voluntades, con el que los particulares se proponen conseguir un resultado que el derecho estima digno de sus especial tutela, sea en [sic] base sólo a ese acto, sea completado con otros hechos o actos". Carmen Moreno-Luque Casariego et als, *Lecciones del Negocio Jurídico*, Oviedo, 1987, en la pág. 22. Es importante establecer que el negocio jurídico siempre reconoce un fin que el ordenamiento entiende prudente proteger o tutelar por razones de política jurídica.

Así, los negocios jurídicos están compuestos por ciertos elementos sin los cuales el negocio no adviene a la vida jurídica. Federico Puig Peña señala que existen requisitos esenciales comunes a todos los negocios jurídicos y otros específicos que deben darse según el tipo de negocio que se efectúe. Elementos comunes esenciales a todos los negocios son, nos dice, la declaración de voluntad y la causa o condición objetiva. Igualmente hay determinados elementos negativos que impiden el nacimiento jurídico del mismo, a saber: no puede referirse a nada imposible; no puede ser ilegal; tampoco puede atentar contra las buenas costumbres o atacar la moralidad. *Véase*, Federico Puig Peña, *ante*, en la pág. 497.

Los tratadistas difieren sobre si el negocio jurídico se extiende al Derecho de Familia. Esta discusión está fundamentada en que algunos comentaristas entienden que al Estado intervenir en la regulación de las relaciones familiares éstas pierden el elemento volitivo existente en el Derecho Privado. Sin embargo otros, entre ellos Luis

Díez Picazo y Ponce de León, entienden que aún cuando el Estado regula la institución familiar por entrañar ésta un gran interés público, la voluntad de celebrar el negocio coexiste con el interés estatal en la regulación del mismo. *Véase* Luis Díez Picazo y Ponce de León, *El Negocio Jurídico del Derecho de Familia*, Instituto Editorial Reus S.A., Madrid, 1962.

En nuestro ordenamiento no hay duda que la adopción es un negocio jurídico. Sin embargo, el requisito de causa sólo se exige expresamente en los contratos; como sabemos los contratos exigen, como requisitos esenciales, consentimiento, objeto y causa. 31 L.P.R.A. sec. 3391 (1990). Es por lo anterior que Eduardo Vázquez Bote señala que la teoría de la causa queda limitada sólo a las obligaciones contractuales. Eduardo Vázquez Bote, *ante*, en la pág. 203. Sin embargo, conviene apuntalar lo que Díez Picazo aclara que, el hecho de que el Código Civil español, y en nuestro caso el puertorriqueño, no hable expresamente de causa en los negocios jurídicos familiares no equivale a decir que éste sea un negocio jurídico sin causa o que la causa carezca de relevancia. Así sostiene que:

> [c]ausa necesariamente han de tener todos los negocios jurídicos. Sin una razón que lo justifique, el negocio carece de sentido. La causa es la razón que dota de sentido al negocio. Es, objetivamente, la finalidad práctica que el ordenamiento jurídico tutela y, subjetivamente, la común intención de las partes de alcanzar finalidad. Desde este punto de vista el elemento causal existe en los negocios de Derecho de [F]amilia.

Luis Díez Picazo, *ante*, en la pág. 21. En este sentido, la causa "es la función económico-social que el negocio lleva a

cabo. La actividad negocial, es decir, el negocio mismo, se justifica porque sirve a una función como instrumento para lograr un fin que la sociedad estima relevante, digno de acometerse y de conseguirse". Eduardo Vázquez Bote, *ante*, en la pág. 185.

En el caso de la adopción, la causa del negocio es "brindar una familia a quien ha sido abandonado por la propia o carece de ella, y al mismo tiempo ofrecer la posibilidad de que críen un hijo a aquellas personas que así lo desean, concretando el propósito de actuar como padres o madres". Jorge O. Azpiri, *Derecho de familia*, Editorial Hammurabi S.R.L., Buenos Aires, 2000, en la pág. 442-43. En efecto, la actividad social valorada en el negocio jurídico de la adopción es el ofrecimiento del calor de una familia a aquél que no la posee. El Derecho protege y estatuye la adopción dado su fin, toda vez que considera deseable y por tanto susceptible de protección, que otro haga su hijo a aquél a quien su familia biológica no quiere o que, simplemente, carece de ésta. Así, hemos dicho anteriormente que la misma tiene varios propósitos: "[e]n el aspecto social, tiene el fin de brindarle a los niños sin padres la oportunidad de criarse y educarse como es debido en el seno de un hogar adecuado, mientras que a su vez facilita a aquellas personas que loablemente han optado por acoger a dichos niños como si fueran biológicamente suyos, para atenderlos y brindarles el calor y la estabilidad de una familia funcional. Ello, en atención a la problemática social que aqueja a nuestra sociedad de niños abandonados o

maltratados dentro de un hogar en el cual se supone que reciban amor, protección y cuidado". *Zapata et al. V. Zapata et al.*, 156 D.P.R. 278 (2002), en las págs. 286-287. (Citas omitidas).

Por el valor social que la institución de la adopción tutela, es imprescindible auscultar si ésta ha tenido causa. Esto, porque al ser un negocio jurídico familiar, "[s]i la causa es ilícita, inexistente, inasequible, el negocio tiene que resentirse en sus efectos, porque el Derecho hace posible la eficacia jurídica en función de la causa". Vázquez Bote, *ante*, en la pág. 201. (Citas omitidas).

Ahora bien, lo anterior parece colisionar con el carácter perpetuo e irrevocable de la adopción. Sin embargo, tal como Puig Peña señala, ese carácter de perpetuidad es

> en el sentido de que no puede existir en su constitución ninguna interferencia restrictiva en cuanto al tiempo para hacer cesar ese estado. Pero de la existencia de esa especial condición jurídica no se infiere tampoco que necesariamente tenga que subsistir siempre la adopción, pues sobre ella deben también valer los principios que informan la cesación de los institutos jurídicos.

Federico Puig Peña, *Compendio de Derecho Civil Español*, Ediciones Pirámides S.A., Madrid 3ra ed. revisada y puesta al día, t. V, 1976, en la pág. 488. Sin embargo, la irrevocabilidad de un decreto de adopción está dirigida a que

> el estado civil creado por la adopción no puede quedar pendiente a un cambio de voluntad o resolución unilateral del adoptante, de igual modo que no sería válida (no podría ser aprobada por el Juez) una condición resolutoria impuesta en el negocio jurídico de adopción, ni un plazo resolutorio. Tampoco cabría admitir la extinción

por mutuo disenso de las partes porque no puede quedar a su libre arbitrio la subsistencia de un estado civil.

José Puig Butrau, *Fundamentos de Derecho Civil*, Bosch, Barcelona 2da ed., t. IV, 1985, en la pág. 239. Indudablemente, el mandato de irrevocabilidad está dirigido a proscribir el capricho y la arbitrariedad, no a mantener vivo un negocio que nunca tuvo causa y por tanto no advino a la vida jurídica.

Es importante señalar que, según señala Puig Butrau, "la adopción podrá ser ineficaz en otros casos, como la nulidad por defecto de capacidad, por falta de consentimiento del adoptante y el adoptado mayor de catorce años, **por inexistencia o ilicitud de la causa**, por no haber recaído la aprobación judicial o por defecto de forma". José Puig Butrau, *ante*, en la pág. 239. (Énfasis nuestro). Es lógico que sea de esta manera porque de lo contrario se estaría manteniendo la validez de un negocio que, a todas luces, adolece de nulidad radical o es nulo *ab initio*. En una adopción sin causa el adoptado no ha recibido el calor del hogar que lo hizo su hijo ni ha convivido con sus padres en el seno de la familia. Tampoco se ha roto el vínculo emocional con su familia biológica dado que es ésta quien, a pesar del decreto de adopción, se mantiene a cargo del menor ocupándose de los cuidados y atenciones que el mismo requiere. En una adopción sin causa nunca se configura el fin principal de la institución: ofrecer padres a aquellos menores que, por múltiples circunstancias, carecen de ellos procurando el mejor bienestar e interés del niño.

**B**

Un término es de caducidad cuando no admite interrupción o suspensión. Por lo cual, "éste siempre extingue el derecho a la causa de acción con el mero transcurso del tiempo. Su propósito es fijar de antemano el término dentro del cual podrá ejercitarse un derecho. Una vez comienza a transcurrir un término de caducidad, no hay forma de revivirlo en su totalidad. *Zulma Muñoz Rodríguez v. Ten General Contractors*, 167 D.P.R. 297 (2006), en la pág. 302.

Al momento de que se decretara la adopción del adoptado el Código de Enjuiciamiento Civil disponía un término de caducidad de dos años para solicitar la anulación de la misma. Luego de transcurrido ese término se entendía subsanado cualquier defecto del cual pudiera adolecer el procedimiento. *Véase* Art. 613E del Código de Enjuiciamiento Civil, 32 L.P.R.A. sec. 2697(1990). No obstante, debe decirse que dicho término sólo puede transcurrir contra negocios jurídicos susceptibles de ser anulables, no contra aquellos que adolezcan de defecto tal que impida su advenimiento a la vida jurídica.

Así, un negocio jurídico es inexistente cuando "no puede producir la plenitud de los efectos deseados por las partes *debido a la ausencia de un elemento constitutivo* de tal trascendencia que le impide venir a la vida con el mínimo indispensable para gozar de capacidad vital". Federico Puig Peña, *ante*, t. 1, en la pág. 660. (Énfasis en el original). Es por ello que "[e]l acto nulo no puede

producir, ni produce, los efectos pretendidos por las partes y, por consiguiente, no engendra ni da lugar a relación jurídica de ninguna clase *(quod nullum est nullum producit effectum)*. *Id.*, en la pág. 664. (Énfasis en el original). En este sentido, tampoco se puede oponer contra un negocio jurídico nulo los términos de caducidad establecidos por el ordenamiento para aquellos casos en que el mismo adolezca de defectos. Lo anterior porque la nulidad provoca que "[l]a situación jurídica [permanezca] como estaba antes del negocio, y los interesados o cualquiera [puedan] seguir comportándose, a tenor de ello, como si aquél no existiese". Manuel Albaladejo, *Derecho Civil*, Bosch S.A., Barcelona 11ma ed., t. 1 v. 2do, 1991, en la pág. 461.

**III**

Como señaláramos anteriormente la adopción es un negocio jurídico familiar. En tanto tal, los tratadistas establecen deben concurrir dos elementos esenciales para que éste advenga a la vida jurídica: una declaración de voluntad y la causa que justifica el negocio. Un negocio que carezca de alguno de estos elementos será nulo y por tanto no producirá efectos jurídicos.

Igualmente, hemos visto que la causa de la adopción es proveer una familia a aquel menor que carece de ésta siempre procurando el mejor interés y bienestar de éste último. Por ello, la normativa imperante al momento de decretarse la adopción del adoptado requería que éste se tratase de manera igual que un hijo biológico. En este sentido, debía proveérsele todos los cuidados necesarios, profesársele

cariño y mantenérsele bajo la custodia de los adoptantes siempre en búsqueda de su mejor interés y bienestar. De lo contrario, el fin mismo de la adopción dejaría de ser el mejor interés y bienestar del adoptado y pasaría a ser meramente la otorgación de los apellidos del adoptante.

Además, indicamos que un término de caducidad sólo puede ser opuesto a un negocio jurídico válido. Éste no puede operar contra una negocio que nunca ha advenido la vida jurídica, hacerlo de otra manera implicaría convalidar un negocio que nunca existió y conferirle efectos jurídicos a lo que nunca los tuvo.

En el caso ante nuestra consideración los recurridos alegaron que los adoptantes jamás trataron como hijo al adoptado. Este último testimonió que los adoptantes "nunca cumplieron con sus obligaciones de proveer alimentos, cuidado, educación, afecto y amor hacia mí [adoptado]", según se desprende de la declaración jurada que hiciere el adoptado. Lo anterior en contravención a lo declarado por los adoptantes en la vista de adopción donde se obligaron a tratar al adoptado como hijo biológico y proporcionándole todo lo necesario para su desarrollo físico y emocional.

Al mismo tiempo, los recurridos declararon que el adoptado siempre estuvo a cargo de su madre biológica. Además sostuvieron que luego de convivir un tiempo en un cuarto de servicio en la casa de los adoptantes se mudaron definitivamente de dicha residencia cuando el adoptado tenía seis años de edad. Según alegan, los adoptantes nunca reclamaron la custodia del adoptado.

Contrariamente, los peticionarios basan su petición de *certiorari* en dos argumentos principales. Primero, argumentan la caducidad de la acción de impugnación del decreto de adopción y aducen que los recurridos dejaron transcurrir el tiempo y que nada hicieron para instar la acción dentro de los términos establecidos en ley. Por otro lado, afirman que el Tribunal de Apelaciones debió aplicar la doctrina de cosa juzgada o determinar que existía impedimento colateral por sentencia al caso de marras.[180] Subrayan, en lo que la Lógica consideraría *un argumentum ad terrorem*, que la sentencia del tribunal intermedio atenta contra la estabilidad de los decretos de adopción y que, de confirmarla, estaríamos ante el fin de la institución. Además, distinguen su situación de la que tuvimos ante nuestra consideración en *Martínez Soria v. Ex Parte Procuradora Especial de Relaciones de Familia*, 151 D.P.R. 41 (2000). Aducen que, a diferencia de *Martínez Soria*, donde la adoptada esperó cinco meses y una semana luego de advenir a la mayoridad para impugnar el decreto de adopción, en este caso se pretende impugnar la adopción luego de transcurridos doce años a partir de que el adoptado llegara a la mayoría de edad. De igual manera, afirman que al haberse resuelto

---

[180] Por estar de acuerdo con la discusión de la doctrina de cosa juzgada y de su variante, el impedimento colateral por sentencia, expuesta en la opinión mayoritaria, no abundaremos sobre la misma. Sin embargo, conviene resaltar lo que anteriormente hemos dicho: "[n]o se dará aplicación en forma inflexible a la defensa de cosa juzgada cuando al así hacerlo derrotaría los fines de la justicia, especialmente si hay envueltas consideraciones de orden público". *Pagán v. Hernández*, 107 D.P.R. 720 (1978); *Millán v. Caribe Motors Corp.*, 83 D.P.R. 494 (1961); *Pérez v. Bauzá*, 83 D.P.R. 220 (1961).

*Martínez Soria*, *ante*, por sentencia no vincula a este Tribunal ni a ninguno de los foros inferiores.[181]

No obstante lo anterior, nada señalan para controvertir lo alegado por los recurridos en cuanto a que los adoptantes nunca trataron como hijo al adoptado. Tampoco desmintieron que, como cuestión de hecho, el adoptado siempre convivió con la madre biológica, haciéndose cargo esta última de proveer el cuidado, sostén económico, moral y emocional del adoptado.

Las alegaciones de ambas partes parecen indicar que, en el caso que nos ocupa, nunca se configuró el negocio jurídico de la adopción. Esto toda vez que la causa del mismo aparenta no haber existido. Los recurridos arguyeron, y los peticionarios nada dijeron para controvertirlo, que los adoptantes no le brindaron al adoptado el calor de un

---

[181] La Opinión Mayoritaria dedica varias páginas a discutir y reseñar la sentencia que emitiéramos en *Martínez Soria v. Ex Parte Procuradora de Relaciones de Familia*, *ante*. Como sabemos, las sentencias de este Tribunal no están revestidas de la autoridad del precedente, aunque pueden ayudarnos a ilustrar diferentes posturas sobre una controversia. Por entender que los hechos ante nuestra consideración son diferentes a los de la sentencia invocada, soy del criterio de que no son de aplicación al caso de autos los argumentos esbozados en las Opiniones que acompañaron la Sentencia en *Martínez Soria*. Allí se trataba de una joven que al advenir a la mayoridad solicitó se impugnara el decreto de adopción mediante el cual el esposo de su madre se había convertido en su padre adoptivo. La joven sostuvo que éste la había adoptado sólo para continuar el patrón de abuso sexual que venía perpetrando desde que ésta tenía trece años. A diferencia de la controversia que tenemos hoy ante esta Curia, la joven vivía con el adoptante y su madre biológica como familia, situación de la cual éste se aprovechó para llevar a cabo sus fechorías. En dicho caso resolvimos que, por las circunstancias particulares del caso, había incidido el Tribunal de Circuito de Apelaciones al desestimar la causa de acción de la joven resolviendo que ésta había caducado. Resolvimos por Sentencia toda vez que lo decidido tuvo distintos fundamentos. *Véase Martínez Soria*, *ante*.

hogar, tampoco lo acogieron como si fuera su hijo biológico, siendo su madre biológica la única encargada de su cuidado y manutención.

Más aún, nunca explicaron el porqué de la partida del adoptado junto a su madre biológica de la residencia que compartían con los adoptantes. Tampoco argumentaron haberlo procurado o reclamado su custodia. No existe evidencia en el expediente de que el adoptado haya convivido con los adoptantes más allá de los seis años que compartió la vivienda con éstos.

Los autos del caso dan la impresión de que el negocio jurídico de la adopción careció de causa. De ser esto así, la misma fue nula *ab initio* y por tanto nunca se configuró. Si bien no podemos avalar que aquello que nunca existió nazca por el mero transcurso del tiempo, cierto es también que los méritos de este pleito no se dilucidaron en una vista evidenciaria. Por lo cual, antes de oponérsele el término de caducidad dispuesto en ley para la impugnación de un decreto de adopción procede primero determinar si la misma existió.

Es importante dejar claro que lo anterior no es una licencia para atacar indiscriminadamente la validez de los decretos de adopción. La adopción, cuando configurada, es un acto de carácter irrevocable que **no está a la merced del arbitrio y del capricho de cualquiera de las partes.** Es norma reiterada que, en nuestro ordenamiento, un decreto de adopción establece un vínculo jurídico entre el adoptado y el adoptante que es de igual jerarquía al vínculo biológico

entre un padre y un hijo.  De esta manera, el adoptado que reniega de sus padres adoptivos o los padres adoptivos que reniegan del adoptado tienen los mismos remedios disponibles que un hijo o un padre biológico cuando alguno de éstos no cumple con sus obligaciones o deberes.

Ahora bien, sí deben considerarse aquellos casos **excepcionales** en que, como la situación que tenemos ante nosotros, la adopción aparentemente careció de causa o adoleció de otro defecto que haya provocado que ésta sea nula *ab initio*. No hacerlo implicaría amparar un estado civil que no tiene base fáctica que lo sustente. Es por esto que entiendo necesario que se celebre una vista en los méritos que arroje luz sobre si se configuró  o no el negocio jurídico de la adopción.

**IV**

Por los fundamentos antes expuestos devolvería el caso al tribunal de instancia para que celebrara una vista en los méritos sobre la existencia de causa en la adopción del señor Samuel Beníquez Méndez.  Una vez celebrada, estará el tribunal primario en posición de determinar si procede o no oponérsele a este caso el término de caducidad de dos años dispuesto por el derogado artículo 613E del Código de Enjuiciamiento Civil a la adopción del recurrido. Estando en entredicho la validez del negocio jurídico ante nuestra consideración se hace innecesario en este momento pronunciarnos sobre la procedencia de la acción de filiación contra el alegado padre biológico.  De decretarse nula la adopción el adoptado tendría entonces la oportunidad de

llevar una acción de filiación durante toda la vida del alegado padre biológico.


                              Anabelle Rodríguez Rodríguez
                                    Juez Asociada